[No. 30692. Department Two. November 1, 1948.]

IRA CARLEY et al., *Respondents*, v. PRESTON ALLEN et al., *Appellants*.[1]

[1]Reported in 198 P. (2d) 827.

*Ray R. Greenwood* and *Roy A. Holland,* for appellants.

*Merrill Wallace,* for respondents.

SIMPSON, J.—This appeal involves a charge of negligently repairing an automobile belonging to plaintiffs. The court entered judgment against defendants, and they have appealed.

The assignments of error challenge (1) the correctness of the trial court's findings, conclusions, and judgment; (2) its failure to find contributory negligence on the part of respondents; (3) its refusal to grant the foreclosure of a lien as against respondents; and (4) its rejection of a motion to dismiss the action against appellants Desmond and Ziegler.

The controversy was brought about in the following manner: Respondents owned a 1941 Chrysler automobile which was in need of repairs, and took it to appellants Allen, who were conducting a general repair garage near Burley. Respondents were told by Allen that some work on the motor would have to be done in Tacoma. Allen then removed the motor from the car and delivered it to appellants Desmond and Ziegler, copartners, who were operating a machine and repair shop in Tacoma under the name of Desmond Motor Parts. At Desmond Motor Parts, the block of the engine was rebored, new pistons were installed, and additional work was done on the motor block. W. H. Lawrence, a mechanic working at the Tacoma repair shop, installed in the motor block round ground pistons manufactured by the Tsengani Piston Company of Tacoma, which company specified that their pistons could be either cam, or round ground. The car was redelivered to respondents late in February, 1947.

March 4, 1947, they started on a motor trip to Ohio. Prior to starting on the trip, Carley had driven the car seven hundred fifty or a thousand miles on short trips. On one occasion, he operated it at a speed of fifty miles per hour. After crossing the Lake Washington bridge, he drove the car at about sixty miles per hour until he approached Moses

Lake, at which place the car became sluggish and he gave it more gas to maintain his speed. A piston then broke and forced a connecting rod through the block of the motor. Respondents had the car towed to Port Orchard, at which place they had a new motor installed at a cost of five hundred seventy-five dollars.

The car had an overdrive mechanism, which reduced the motor speed to that which would equal an ordinary car driven at forty-five or forty miles per hour. However, motors work harder when the overdrive is used.

Because of the fact that the charge of negligence is grounded upon the manner in which the pistons in respondents' engine were ground, we deem it necessary to refer to the evidence relating to the repair.

William D. Loudon, service engineer of the Chrysler sales division of Chrysler Corporation, testified that the shape of the finished piston shipped from the Chrysler parts division was elliptical, and the semifinished pistons were round; the semifinished pistons should be "cam ground elliptical"; the effect of finishing a semifinished piston circular would be that "The piston would be likely to stick when the motor became heated."

James M. Gwin, an automobile mechanic of twenty years' experience who had general supervision of the Richardson-Jensen's Motors, explained that when a motor is rebored "you rebore the motor to fit the pistons." Chrysler pistons are cam ground. Asked the meaning of "cam ground" he stated:

"They are smaller on one side than the other. Q. That makes an elliptical shaped piston? A. That is right. Q. That elliptical shape—does that have to be determined by a micrometer? A. It is so close, you can't hardly see it—it is done with a machine. Q. And the measurements are taken by micrometer? A. Yes."

George Kress, operator of the South Kitsap Motors for a period of ten years, testified that he received the Carley car when it was towed back from Moses Lake and supervised the task of installing a new motor in it. He said that the cost of rebuilding the old motor would exceed that of a

new one because seven of the cylinders were scored very deeply, and the eighth one had broken the cylinder sleeve and thrown an arm into the water jacket. He said that the Chrysler specifications stated that their pistons should be cam ground. He gave the following testimony:

"Q. Now, from your experience, can you say, Mr. Kress, what caused this piston to bind in the cylinder wall? A. Well, a number of things could cause it. The real reason why that piston would bind would be from it not having enough clearance, and naturally it expanded to a size as great or greater than the cylinder it travelled in. When it became greater than the cylinder it travelled in, naturally it had to break, the piston would swell to beyond its size and would become larger than the cylinder it travels in."

Mervin L. Hall, the mechanic at South Kitsap Motors who installed the new motor in respondents' car, testified that he had made an examination of the Carley motor when it was brought in from Moses Lake.

Another witness, W. H. Lawrence, had been engaged for twenty-five years as an automotive mechanic. His principal work was that of reboring motors and fitting pistons. He did the work on respondents' motor at Desmond Motor Parts and testified that:

"Q. In connection with this work, do you receive from the manufacturer of the pistons you install, a chart telling what lee-way or allowance to allow,—[Interpolation] Q. Do you receive such a chart with the pistons? A. Yes, always. Q. And these particular pistons that were installed in this car—this one, for instance, and the others in the same car? Do you know what factory they came from? A. Yes. Q. Where? A. Tsengani Piston factory in Tacoma. Q. Have you been installing their pistons for some time? A. I think the first Tsengani piston I installed was 1929. Q. And have you been using those pistons continuously, ever since? A. Yes. Q. State whether or not you have installed Tsengani pistons in other Chrysler automobiles on previous occasions? A. Yes, I have. Q. In models as late as '41? A. '41—'42, yes, I have. Q. Have you any idea how often you have installed them— THE COURT: In Chryslers. A. I put the first one in in 1929,— THE COURT: Would you say, one or a hundred? THE WITNESS: Oh, I would say several hundreds. Q. Several hundreds? A. Yes. Q. And to your

knowledge, have you had any trouble, subsequently, about it? A. No, Sir. Q. And have any of these pistons been round ground? A. Round ground, yes. Q. Not all of them? You cam grind them, too? A. Yes. Q. I'll ask you whether or not in your opinion, round ground pistons can be used as well as cam ground pistons? A. Oh, yes, definitely. You can use either one. Q. Is there anything un-workmanlike, to your knowledge, in using a round ground piston product in a Chrysler car? A. Not a bit. Not a bit. Q. What clearance did you allow, if you remember, between the piston wall and the side wall of the cylinder in this job? A. 2½ to 3 thousandths. Q. What is that? 2½ to 3 thousandths of an inch? A. Yes, on this particular type of piston. . . .

"Q. Mr. Lawrence, when you finished this job, in your opinion was it done as carefully as you do any other job? A. Yes. Q. Is there any way in grinding, a mistake could be made, so they wouldn't fit right or work right? A. Well, it would be possible, but that is double-checked. Q. How is it double-checked? A. Well, the first thing you do, is rebore the block and then you start to fit your piston. You measure up the block and then fit the piston. And then you leave them in the hole and check the thickness,— Q. And did you do that in this case? A. Yes. Q. Do you have any independent recollection of this job? A. Yes. Q. And you did a good workmanlike job? A. Yes. Q. And used good material? A. Yes. Q. Showing you this exhibit, marked, Defendant's Exhibit No. 1 [unused piston], you notice the slot down at the side? Will you explain to the court what that is for? A. That is to take care of the expansion of the piston. These pistons come in what we call, 'semi-finished' condition. They are just roughly turned. This slot is not completed—not completed in this piece, here, (indicating on exhibit) or not completed here. We place this piston, first, in the lathe, and rough cut off the extra part to get it down to grinding size, leaving ten thousandths of an inch to be taken off in grinding,—in grinding it down to fit the particular cylinder. Then we fit the pistons. Then we come to the slot on this particular piston. We saw it all through. Q. In the cam ground pistons, do you cut that on through? A. Definitely not, because the pistons will not stand up, but will break, because there is no support. Q. No outer wall support from the block, you mean? A. None, whatever. Q. This distance is the same distance from the block all around? A. All around, that is right. Q. What is the purpose of the cam grinding, if you know? A. Well, the pur-

pose,—the theory on cam grinding— is the theory that the pistons get hot and she rounds up of her own accord. This fits tight on the two trusses on these two sides. As she gets operating, she dances around into a round shape. That is, this piston here, remains round. Q. But if broken in with ordinary care, the round ground piston is just as much service as the cam ground piston? A. Yes. Q. Do you regard it any better than the cam ground piston? A. I wouldn't say it is any better. I would say it is just as good, personally. I have used thousands of these. I have used thousands of cam ground pistons. . . .

"A. What was the matter with it [block of motor] most was the piston had broken and gone through the wall. The rest had scored. Q. What would cause *this* things to score? A. Excessive heat. Q. Excessive heat? A. Yes. Q. Does this piston look like one of them (Showing witness Plaintiffs' Exhibit 'G')? A. It looks like one of the pistons. I testified it does. Q. Does it show score marks? A. It does. Q. That heat could be caused from what? A. That heat can be caused from a number of things,—among them, speed. Q. What else? A. Lack of water. Q. What else? A. Loose fanbelt. Q. Anything else? A. If the water pump was not working properly. If the radiator was not thoroughly clean, it could cause it. Q. Anyone of those things? A. Anyone of those things. Q. Wouldn't a shortage of oil also cause it? A. Yes. . . .

"Q. Have you had any more difficulty with cam ground pistons than round ground pistons? A. No, I have had no difficulty with either type. Q. You have had no difficulty with either type, that you know of. This Exhibit, then, could have been cam ground and put in that motor? A. Yes."

Appellant George T. Desmond's testimony regarding the mechanism of grinding pistons was to the same effect as that of Mr. Lawrence. A portion of his testimony is as follows:

"Q. What number of things, if there are more than one which would cause heat in the motor? A. A radiator low in water would cause it, a fan belt loose—if it didn't happen to break, it wouldn't turn the pump over and would cause it. Excessive driving would cause it, especially with a new motor, because it creates a certain amount of friction and it would commence to overheat. That is why everyone is cautioned with a re-built motor to drive slowly. Q. Assuming this car had been driven, say, 550 miles, and then it

was driven 200 miles further, at a more or less steady speed of 60 miles an hour, with a few stops between here and Coulee City,—would that be too fast? A. I would say so, for that particular motor. That would be too fast. If I may elaborate on that, a little bit,—you might drive a car like that two blocks but when you drive it for miles on that particular job at 60 miles an hour, then you start to do damage on a new motor or a re-built block, unless you would leave a terrific amount of clearance for the pistons. There is no use re-building the block, then. Q. In other words, they should be worked till it is worn sufficiently to work up and down without heat? A. That is right."

Newton J. Buren, a mechanical engineer and president of the Tsengani Piston Company, testified:

"Q. . . . What, in your opinion, caused these pistons to stick and to score? A. Well, they haven't stuck. Those pistons never stuck. No, no piston will stick where there is pressure only on one side. They won't do that. Q. You say it couldn't have been due to too much heat, then? A. Yes, that is exactly what it was. Q. From too much heat? A. Too much heat from friction. THE COURT: What caused the piston arm to go through the block? THE WITNESS: The high piston speed of new parts—your piston rings and your pistons, together—specifically, your piston rings—that did it."

 The law which governs this and cases of like nature may be found in the following citations:

The duty of care imposed upon individuals who repair personal property has been determined in the recent case of *Burr v. Clark*, 30 Wn. (2d) 149, 190 P. (2d) 769, where it is stated:

"In *Arkansas Machine & Boiler Works v. Moorhead*, 136 Ark. 18, 205 S. W. 980, 1 A. L. R. 1652, the legal duty imposed upon a person who undertakes to repair machinery is set forth in the following quotation:

" 'One holding himself out as a machinist and accepting employment to repair a steam engine is presumed to know the character of the work he is about to do and the results likely to follow a negligent performance of his work, and is therefore liable for the damage proximately resulting from a negligent and unskillful performance of his work. *Gibson, Lee & Co. v. Carlin*, 13 Lea (Tenn.), 440; *Livermore Foun-*

*dry & Mch. Co. v. Union Com. & Storage Co.*, 105 Tenn. 187, 53 L. R. A. 482; Sutherland on Damages, sec. 702.'

"In the annotation to the cited case, appearing in 1 A. L. R. 1654, it is stated:

" 'The rule supported by the decided weight of authority is to the effect that one who contracts to make repairs, and performs the work in an unskilful or negligent manner, is liable for the damage proximately resulting from the improper performance, and which can be regarded as having been within the contemplation of the parties.' "

The law is also well stated in the following quotation from 7 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.), 546, § 5029:

"A contract of bailment of an automobile for repairs with a garage keeper imposes upon him the duty to use ordinary care, not merely to select competent employees, but to do the work required with ordinary skill and judgment. If he employs such ordinary care and skill, he will not be liable for negligence in making the repairs, although he has not followed the best fashion or method. The burden of showing want of ordinary skill is upon the automobile owner, and where the testimony does not reasonably exclude other causes of the accident than improper workmanship, the jury cannot be permitted to guess that the accident was caused by negligence."

See, also, 15 A. L. R. 681-691; 44 A. L. R. 824; *Whittaker v. Kirchman*, 171 Ark. 1029, 287 S. W. 168, 49 A. L. R. 316.

■ Negligence will not be presumed. *Hoover v. Goss*, 2 Wn. (2d) 237, 97 P. (2d) 689.

The party alleging negligence must prove that negligence existed (*Kedziora v. Washington Water Power Co.*, 193 Wash. 51, 74 P. (2d) 898); and, further, that the negligence was the proximate cause of the injury (*Wilkie v. Chehalis County Logging & Lbr. Co.*, 55 Wash. 324, 104 Pac. 616; *Johanson v. King County*, 7 Wn. (2d) 111, 109 P. (2d) 307).

Another rule of the same tenor is:

"If there is nothing more tangible to proceed upon than two or more conjectural theories under one or more of which a defendant would be liable and under one or more of which a plaintiff would not be entitled to recover, a jury will not be permitted to conjecture how the accident occurred." *Gardner v. Seymour*, 27 Wn. (2d) 802, 180 P. (2d) 564.

Another statement of the law is:

"In showing that the negligence charged was the proximate cause of the injury, it is not enough for the plaintiff to prove that the negligence might perhaps have caused the injury. If, for example, the injury complained of might well have resulted from any one of many causes, it is incumbent upon the plaintiff to produce evidence which will exclude the operation of those causes for which defendant is under no legal obligation. If the cause of the injury to the plaintiff may be as reasonably attributed to an act for which the defendant is not liable as to one for which he is liable, the plaintiff has not sustained the burden of fastening tortious conduct upon the defendant. The fact that a defendant joins issue upon a complaint containing a general averment of negligence, without moving to make the pleadings more definite, does not relieve the plaintiff from proving a particular act of negligence upon which to base his right to recover." 38 Am. Jur. 975, Negligence, § 285.

■ The trial judge based his decision entirely upon the fact that the pistons in respondents' motor had not been ground in accordance with the method recognized by the manufacturer of the car. He stated:

"And I think defendants were guilty of negligence and carelessness in accepting their own version of how they should be ground, rather than accepting the manufacturer's admitted recommendations and suggestions, because they didn't have the equipment to cam grind. I think there is clearly negligence in this case, in my opinion."

We are unable to agree with the conclusion arrived at by the trial court. There is no evidence in this case from any witness that the manner of grinding the pistons by the Desmond Motor Parts Company was done in a negligent manner or caused the damage to respondents' automobile. The legal duty was upon respondents to prove that appellants were negligent and that their negligence was the proximate cause of the injury to their automobile.

The court, as we have indicated, based its conclusion upon the fact that the appellants had not ground the pistons as indicated by the instructions sent from the Chrysler corporation. Those recommendations, instructions, or requirements, whatever they were, have not been introduced in

evidence. Neither the trial court nor the members of this court have had any opportunity to examine them; and whether they were directions, commands, or simply recommendations, is not apparent.

By cross-complaint, appellants Allen ask for judgment foreclosing their lien for work performed on respondents' automobile. The uncontradicted evidence showed the amount of the work done by appellants and the reasonable charge for that service. It follows that the lien must be foreclosed.

The judgment is reversed, with instructions to enter judgment in accordance with this opinion.

MALLERY, C. J., MILLARD, ROBINSON, and SCHWELLENBACH, JJ., concur.

