Dale ROSS, Appellant,

v.

GREAT NORTHERN RAILWAY COM-
PANY, a corporation, Appellee.

No. 18278.

United States Court of Appeals
Ninth Circuit.

March 13, 1963.

Rehearing Denied April 12, 1963.

Grant L. Kimer and Riner E. Deglow,
Spokane, Wash., for appellant.

R. Paul Tjossem, Woodrow L. Taylor,
and Thomas J. Wetzel, Seattle, Wash.,
for appellee.

Before CHAMBERS, ORR and
BARNES, Circuit Judges.

BARNES, Circuit Judge.

Appellant sued appellee in two causes
of action for serious personal injuries.
The first cause of action was based on the
Federal Employers' Liability Act (45
U.S.C. §§ 5 and 51 et seq.), herein
sometimes referred to as "F.E.L.A."
The second cause of action was a common
law action for negligence. Both were
submitted to a jury, which found, in an-
swers to special interrogatories: That
Great Northern Railway was negligent;
that such negligence was a proximate
cause of appellant's fall and injuries;
that Spokane International Railroad was
not negligent; that appellant himself

was not negligent; that the appellant was not an employee of either defendant; that appellant sustained damages in the sum of $20,000.

The F.E.L.A. thus being out of the case, the trial judge (as he had strongly indicated he would do when he submitted the issue of employment to the jury)[1] granted a judgment notwithstanding the verdict to the defendant Great Northern Railway Company.

The sole question on appeal is whether the jury verdict was properly set aside and whether the judgment notwithstanding the verdict was properly entered. This was a diversity case (28 U.S.C. § 1332), if not an F.E.L.A. case (28 U.S.C. § 1331). Jurisdiction exists here under 28 U.S.C. § 1291.

The circumstances leading up to the accident itself were generally undisputed. They were these:

On March 19, 1959, Kaiser Aluminum had a shipment of aluminum sheets to be moved from its Trentwood plant near Spokane to Seattle and Honolulu. Spokane International Railroad, as the only railway company serving Kaiser's Trentwood plant, was the originating carrier. The shipment was to move piggyback via Spokane International Railroad from Trentwood to Spokane, thence Great Northern Railway Company to Seattle.

The Spokane International Railroad had a contract with Ross Transfer Company for the handling of such trailer on flatcar movements. Under this arrangement, Ross Transfer would deliver a trailer to the shipper for loading of the aluminum, after which Ross Transfer Company would deliver the trailer to rail site and would load the trailer aboard the rail flatcar, secure it to the flatcar, and cover the load with a tarpaulin if required by the shipper.

Pursuant to this arrangement, plaintiff, Dale Ross, on March 19, 1959, delivered a trailer to Kaiser for loading of

aluminum. After supervising the loading of the aluminum, he returned with the loaded trailer to the Great Northern Railway Company tracks near its freight house at Spokane and proceeded to load the trailer upon a flatcar provided by the Great Northern. In the loading of the trailer onto the flatcar, he was assisted by employees of Ross Transfer. He was also assisted by them in securing the trailer to the flatcar and covering the load with a tarpaulin which he had procured from the Great Northern freight house. In the process of turning or unfolding the tarpaulin on top of the load of aluminum on the trailer, which was then on the flatcar, he fell and was injured.

Plaintiff had been one of the partners and owners of Ross Transfer Company until January 1959, when the partnership, which had been incorporated, was sold to Riverside Warehouse. Before he picked up the load of aluminum from Kaiser, plaintiff picked up a tarp to cover the load at the Great Northern warehouse in Spokane. Plaintiff was told by a Great Northern employee where the tarps were located and plaintiff selected his own tarp from the warehouse. We have assumed for the purpose of this opinion that it was a tarp owned by the Great Northern Railway Company, although the tarps in the warehouse from which plaintiff selected the one involved here were owned by various trucking companies, as well as Great Northern Railway Company. When these tarps were returned to Spokane by railroad, they were consigned to Great Northern Agent McFarland and placed at door 11 of the Great Northern freight house, regardless of ownership. According to plaintiff, the tarpaulin which he selected was no different than the others at the freight house. It weighed close to 200 pounds and folded was about 4 feet across, about 1½ feet high, dark green in color, massive, heavy, halfway dirty, and in a used condition. The tarp was bulky,

---

[1]. "If this was unquestionably a common law negligence case, I would not have the slightest hesitancy in dismissing the case for want of proof of either negligence or proximate cause." (Tr. 423)

made of canvas and had eyelets on it, much the same as Exhibits Nos. 31 and 32. They (the tarps) were also expensive, costing between $180.00 and $200.00 apiece and, of course, were waterproof, inasmuch as their purpose was to protect the shipment from damage by rain and the elements.

When plaintiff Ross arrived at the Great Northern piggyback loading ramp with the load of aluminum, he then backed the trailer load of aluminum onto the railroad flatcar and put the original tarp he had selected earlier in the day up on top of the load of aluminum. Plaintiff's brother, Gerald Ross, was helping him with the tarpaulin on top of the load of aluminum. Plaintiff Ross was an expert in the piggyback business and did not need anyone to tell him how to do the details of his job. After plaintiff Ross and his brother Gerald had started to unroll the tarp on top of the load of aluminum, plaintiff had to get down for a moment to get the bill of lading out of the cab of the truck. While plaintiff was away from the tarp for a moment, his brother found that the tarp was placed on the load the wrong way and would have to be turned. When plaintiff got back on the load, his brother told him of the problem and they started to turn the tarp. According to Gerald Ross, his brother grabbed hold of the tarp to help turn it and pulled on the tarp and fell backwards.

Getting to the details of appellant's fall, it was appellant's theory of negligence that there were wires passing through the "eyelets" of the tarp, left on when wires had been used previously to secure the tarp to flat cars, later to be cut (as were the ropes sometimes alternately used) when the tarp was removed as a cover for the aluminum shipped.[2] These wires, with their sharp points, could easily, say appellant's counsel, have caught in the tarp and when

force was used by appellant to unfold the tarp, could have "unexpectedly" given way, "plunging"[3] or "catapulting"[4] the appellant to the concrete floorway of the loading dock.

There exists a considerable difference of opinion between counsel, both as shown by their briefs and expressed at the time of oral argument, as to just how the accident occurred; what force appellant exercised and against what object; where he was standing; whether the tarp was *folded* "wrong", or was *placed* "wrong" on the load, etc.

For that reason we have carefully searched the record, and rely only on what was testified to by the various witnesses:

(1) Appellant testified the tarp "was not folded correctly" (Tr. 97, l. 3); "it was folded wrong" (Tr. 97, l. 6); the tarp was placed "crosswise of the car" (Tr. 98, l. 13); and not completely unfolded (Tr. 98, ll. 18–19).

"If it was folded right, you could set it on top of the load, in the center of the load, and roll it from both ends out * * * and it will automatically fall down over the load" (Tr. 99, ll. 14–18); but is "not [then] completely unfolded" (Tr. 100, l. 18). "[A]fter you get it elongated out lengthwise," you "put it on over the sides of the load" (Tr. 100, l. 25, 101, l. 1).

After the tarp was found "in the wrong direction, folded wrong * * we had to put it longways * * * we left it partially unfolded and proceeded to turn it partially unfolded (Tr. 101) * * * We had to turn it so it would fold longways over the load. (Tr. 101) After we had it turned it a ways, we started to unfold it some more" (Tr. 102) and saw wire "two pieces * * * four to six inches long," through the eye-

2. Appellant noticed two wires, in two eyelets. four to six inches in length.

3. The word used in the plaintiff's contentions in the pretrial order.

4. The word used in oral argument, and by appellant (Tr. 113).

lets (Tr. 103). "We were in the process [of turning the tarp]. I stepped across the load to the south side at that time."

"Q. And then what happened at that time?

"A. I reached down, we were pulling and stretching or moving the tarp out, and I was over the side * * * [Tr. 108] * * * I was off about the center [of the load]. * * * [W]e were having a little trouble moving it, not too much, and as I was unfolding it and turning it, it seemed to give way and I went over the side. [Tr. 109] * * *

"Q. Tell us how you happened to lose your grip on the tarp and fall off the load.

"The Court: Let me put it this way, just tell us again, Mr. Ross, what you did at the time and what happened to you.

"A. Well, as I was moving the tarp and unfolding it, I ran into trouble, or it was holding up, and I braced myself to keep the tarp moving and unfolding and something gave way. And I stepped back, I slipped, my hand slipped, I was over the side. I catapulted to the ground. I did not touch the side of the car." (Tr. 113.)

He had been standing sideways, not endwise to the load, facing north, with his back in the direction he fell. (Tr. 207–8.)

(2) On cross-examination, Dale Ross, who was an expert on the piggyback business of putting truck trailers on railway cars (Tr. 178–9; 196), testified he could have put the tarp on at the Kaiser plant when he picked up the load of aluminum or at the loading dock of the Great Northern spur before the trailer went on the flatcar, but "my time was behind" (p. 162), and this was not done, in order "to speed up the operation."

"Q. * * * [I]t was because you were in a hurry?

"A. Yes. [Tr. 163]

"Q. * * * [I]t would have been safer to have taken the tarp down onto the ground and unfolded it and refolded it if it needed refolding? [Tr. 164]

"A. * * * if we had time."

Ross had a six o'clock deadline to meet. (Tr. 200.) His watch, broken in the accident, stopped at thirteen minutes to six. (Tr. 199.)

(3) Mr. Gerkensmeyer, warehouse foreman for the Great Northern Railway Company, testified he had visited Mr. Ross at his house a week or more after the accident.

"Q. Did you inquire about the accident?

"A. Yeah—well, I asked Mr. Ross what happened, and he told me.

"Q. What did he tell you?

"A. He said, 'Just one of those things, Dick,' he said. 'Just lost my balance.'

"Q. Did he make any mention of anything wrong with the tarp?

"A. No." (Tr. 228–9.)

(4) On the evening of the accident, Emery Wellman, Manager of Ross Transfer Company and plaintiff's supervisor, went to the hospital and talked to Mr. Ross. Testimony regarding this conversation between Mr. Wellman and plaintiff Ross at the hospital was as follows (Tr. 320–1):

"Q. All right. Now, referring to the accident itself, you have just stated that you saw Mr. Ross on the night of the accident, is that true?

"A. Yes.

"Q. And as a matter of fact, did you talk to him?

"A. Yes, I did.

"Q. And during that discussion didn't he state that he was careless?

"A. As I recall the conversation, he made the comment that he was in a hurry, and that he guessed he was a little careless.

"Q. And that is the language he himself used?

"A. I believe so."

(5) Mr. Thomas Griffin, an employee of Ross Transfer Company, assisting plaintiff Ross and Gerald Ross in the loading at the time of the accident, testified as follows (Tr. 385–6):

"Q. As a matter of fact, at the time or shortly thereafter, it was your impression that he slipped or tripped on the skids of aluminum, isn't that correct?

"Mr. Kimer: I object. That wasn't covered in the direct examination. I don't recall him testifying to anything about that.

"The Court: Well, I think you inquired about the nature of his fall and this would be in that general area. If he has any knowledge on this. I think he should be interrogated about it. Put him a question, please.

"Mr. Wetzel: Will you read the question?

"(Whereupon, the previous question was read as follows: 'Q. As a matter of fact, at the time or shortly thereafter, it was your impression that he slipped or tripped on the skids of aluminum, isn't that correct?')

"A. That would be the natural impression I would have, yes.

"Q. (Mr. Wetzel) Is that the impression you had at that time?

"A. That is right, at that time."

The same Mr. Griffin testified as follows at Tr. 386–7:

"Q. (By Mr. Hamblen) Mr. Griffin, you said this was an adequate tarp, I think that is the word you used, right?

"A. Yes.

"Q. Speak up.

"A. Yes, that is right."

(6) Plaintiff's brother, Gerald Ross, who was within a few feet of plaintiff when the accident happened, describes the accident as follows (Tr. 399–400):

"A. Well, Dale got down off the load and I was working with the tarp and I unfolded it out.

"Q. How far more did you unfold it?

"A. I don't know, I folded it out far enough to see what we had—it was the wrong way that we had it. We would have to turn it.

"Q. Then did he get back up on there?

"A. Yes, he got back up on top of the load.

"Q. What did he do?

"A. He crossed over the load and he got—he was facing north, standing, and he grabbed ahold of the tarp and I told him when he got up on the load that we would have to turn it.

"Q. What happened?

"A. He either saw or I told him.

"Q. Then what happened?

"A. He grabbed ahold of the tarp and he pulled on the tarp, and he fell backwards.

"Q. What happened in relation to whether or not his body—what happened to him, as he went backwards, you say, what happened to his body?

"A. He went—seemed to go straight back when I saw him going. I knew he was going to be hurt pretty bad, he was off balance, he was going backwards."

In further testimony about the actual accident, plaintiff's brother Gerald testified as follows (Tr. 405):

"Q. Now, with regard to the accident, isn't it your statement that Dale slipped or tripped and then lost his hold on the tarp, and then fell over the south side of the load?

"A. Yes.

"Q. Was the flatcar standing still at the time?

"A. Yes.

"Q. There were no switch engines or switch crew in the vicinity?

"A. Not right at that moment, no.

"Q. Now, it was also your statement that Dale could have tripped on the edge of the crates or slipped on one of the steel bands, is that not true?

"A. Yes.

"Q. Now, you had an uneven footing on top of the load, did you not?

"A. Yes, that is right."

The jury found the plaintiff Ross was not an employee of either railroad. The Federal Employers' Liability Act is therefore not in the case. The trial judge, out of an abundance of caution, permitted the jury to determine if there was any inference of employment by either railroad, so as to bring the Federal Employers' Liability Act into play. (Tr. 423.) When that aspect of the case was eliminated by the special findings of the jury, the case became one purely of common law negligence. The federal statutes, and cases decided in interpreting them, have no place, then or now, in our consideration of the issues now remaining in the case.

Counsel for appellant urges that the railroad failed to present any evidence to explain the fall—that the railroad "failed to bring forward any theory to explain the hanging up and instantaneous release of the tarpaulin," (Brief, p. 38); that "the presence of the only items that could cause the tarp to hang up and then suddenly release, were found by the jury to be the wires through the eyelets of the tarp." (Brief, p. 45.) The jury's interrogatories did not explicitly cover or refer to the wires, nor what caused the fall, nor were any such interrogatories requested or proposed.

The difficulty with appellant's factual position on appeal is that he interprets the language: "a slip—my hand slipped, —something gave way" into a "sudden release *of the wires*—the only items that could cause the tarp to suddenly release." The story told by appellant best suited to his counsel's theory of the case does not support the language used on his behalf in his briefs. It assumes the slip of appellant's hand, the bracing pull appellant made; his moving from the center of the load to the south side, facing north, and his uneven footing all *could not* have caused or proximately contributed to the occurrence of the accident. This without reference to appellant's deadline, his admitted haste, his alleged admitted loss of balance.

As the trial court carefully pointed out:

"Mr. Ross's testimony does not show directly or justify the inference that in his handling of the tarpaulin 'the something' that 'gave way' was a wire or wires in the eyelets of the tarpaulin or some condition in the tarpaulin caused thereby. It is a matter of common experience that heavy canvas when compactly folded is more or less stiff and subject to crinkling and catching in folding. Plaintiff's testimony does not reasonably exclude this and several other equally probable causes of his fall."

Counsel for appellant urgently suggest that the second sentence quoted above constitutes the taking by the trial judge of judicial knowledge of a fact that is not true, and obviously not in evidence; that all heavy canvas may be stiff and subject to catching in unfolding. Without passing on this issue, we do not find it interferes with the validity of the court's conclusion in his third sentence, that appellant's testimony, considered fairly, and honestly, does not reasonably exclude several equally probable causes of his fall, other than the one he urges; the two or three four or six inch wires through the eyelets.

■ Substantial evidence of appellee's negligence and the proximate causal relationship between it and appellant's injuries are required under Washington law. Substantial evidence is required, and a "scintilla" of evidence is insufficient under that law. Wilson v. North.

Pac. Ry. Co., 1954, 44 Wash.2d 122, 265 P.2d 815; Evans v. Yakima Valley Transp. Co., 1952, 39 Wash.2d 841, 239 P.2d 336; Carley v. Allen, 1948, 31 Wash. 2d 730, 198 P.2d 827.

In Wilson v. North Pac. Ry. Co., supra, involving a crossing accident and common law negligence, the Washington Supreme Court said:

"We have held that negligence may be proven by circumstantial evidence. * * * We have also held that proof of negligence does not have to be beyond a reasonable doubt. * * * But this court has never held * * * that the proof of the proximate cause could be left to conjecture or speculation."

The trial court's refusal to grant a motion notwithstanding the jury's verdict was reversed.

In Carley v. Allen, supra, the Washington Supreme Court said:

"Negligence will not be presumed.

"The party alleging negligence must prove that negligence existed * * *, and, further, that the negligence was the proximate cause of the injury." (Citing Washington cases in support of each proposition.) (* * * 198 P.2d p. 831.)

And further, that:

"Another rule of the same tenor is:

" ' * * * if there is nothing more tangible to proceed upon than two or more conjectural theories under one or more of which a defendant would be liable and under one or more of which a plaintiff would not be entitled to recover, a jury will not be permitted to conjecture how the accident occurred.' Gardner v. Seymour, 27 Wash.2d 802, 180 P.2d 564, 569.

"Another statement of the law is:

" 'In showing that the negligence charged was the proximate cause of the injury, it is not enough for the plaintiff to prove that the negligence

might perhaps have caused the injury. If, for example, the injury complained of might well have resulted from any one of many causes, it is incumbent upon the plaintiff to produce evidence which will exclude the operation of those causes for which defendant is under no legal obligation. If the cause of the injury to the plaintiff may be as reasonably attributed to an act for which the defendant is not liable as to one for which he is liable, the plaintiff has not sustained the burden of fastening tortious conduct upon the defendant. The fact that a defendant joins issue upon a complaint containing a general averment of negligence, without moving to make the pleadings more definite, does not relieve the plaintiff from proving a particular act of negligence upon which to base his right to recover.' 38 Am.Jur. 975, Negligence, § 285." 198 P.2d Id. at 831–832.

De Young v. Campbell, 1957, 51 Wash.2d 1111, 315 P.2d 629, upon which appellant heavily relies, merely emphasizes the previously well recognized rule that inferences based upon circumstantial evidence may be sufficient to establish proximate cause. There "[t]he evidence favorable to plaintiff, if believed by the jury, *reasonably excluded the possibility* that the accident was the result *of any cause other* than [her tires] contact with the street car rail." (Emphasis added.) It was, as the court emphasized, "the only conclusion that could fairly and reasonably be drawn."

No such factual situation exists in this case. Many conclusions could fairly and reasonably be drawn from the evidence, including the conclusion that the wires attached to the tarp's eyelets had no proximate relationship whatsoever to the accident and appellant's injuries. As the trial court stated herein below:

"The testimony does not * * * rise to the quality and substance of

the evidence before the * * * court in De Young v. Campbell [supra] the cited decision most favorable to plaintiff."

And see Gardner v. Seymour, 1947, 27 Wash.2d 802, 150 P.2d 564, particularly pp. 569 and 570.

■ Any award, by jury or court, would herein on the evidence before us, rest on speculation or conjecture. As the Washington Supreme Court said in Nelson v. West Coast Dairy Co., 1940, 5 Wash.2d 284, 105 P.2d 76, 130 A.L.R. 606: "[There must be] more than a mere possibility that an accident or injury may have occurred in a particular way." There must exist a reasonable probability the plaintiff's injuries were the proximate result of the defendant's negligence.

Here the appellant, an admitted expert on the proper way to place tarpaulins on loaded trailers placed piggyback on freight cars (flats or gondolas), working without instructions as to how or in what manner he was to place the tarp; facing a deadline and in a hurry to finish his work; moving as he was over an uneven surface to such place and position on top of the load as he desired; without proof of any defective condition in the freight car, trailer, binding chains, tarpaulin, wires, ropes or any other equipment; with no proof anything gave way, or caught, or was suddenly released, has only proved that "something" gave way, including the appellant's grip on the tarpaulin.

This, of course, is not to say that appellants cannot win cases based on inferences arising from circumstantial evidence alone. They may, but as we have pointed out, the evidence must then "reasonably exclude" any other proximate cause. This the evidence here presented to the jury failed to do.

The order of the district court, dismissing the action notwithstanding the general verdict of the jury for the appellant, is affirmed.