**Mary Lou BAKER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Jeffrey J. MIDDLETON et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. Nos. 7734 and 143–72C2.**

United States District Court, W. D. Washington.

Jan. 2, 1975.

---

Arnold I. Bennigson, Law Offices of Floyd A. Demanes, Burlingame, Cal., for plaintiff Baker.

Raymond J. Arata, Jr., Boccardo, Blum, Lull, Niland, Teerlink & Bell, San Francisco, Cal., for plaintiffs Middleton.

John R. Harrison, Dept. of Justice, Civ. Div., Aviation Unit, Torts Section, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BOLDT, Senior District Judge.

### FINDINGS OF FACT

The foregoing cases were tried, to the court, consuming ten trial days, more than seven years after initiation of the law suits, and more than nine years after happening of the accident out of which they arose. Plaintiffs' causes of action arose when an Aaxico Airlines DC–6 aircraft, No. N6541C, crashed into Mt. Rainier, southeast of Seattle, Washington, on April 23, 1965. The actions were brought pursuant to the Federal Tort Claims Act, 28 U.S.C., § 1346 et seq., which is within the jurisdiction of this court.[1]

---

1. The courts oral decision, to the extent not repeated, is incorporated ·herein by this reference.

## Admitted Facts

1. Aaxico Airlines, Inc., was a supplemental air carrier properly certified to conduct non-scheduled flight operations for the carriage of cargo or passengers, for compensation or hire, in air commerce or air transportation. Aircraft N6541C, a Douglas DC–6–6A, was operated in the carriage of cargo pursuant to a military contract and used the call sign "Logair 41C".

2. The aircraft landed at McChord Air Force Base, Washington, completing a prior segment of flight at approximately 11:18 a. m. on April 23, 1965. Subsequent flight planning involved a short flight, direct to Boeing Field, Seattle, Washington, with an hour and a half operation and refueling stop, thereafter to Hill Air Force Base, Ogden, Utah, via a flight plan route which included a V4 (Seattle VORTAC 102° radial) to Burley, V101 Ogden direct to Hill Air Force Base. The flight plan filed by the captain, Alvin Petry, was on a Form DD–175. The military flight plan was filed with the Military Air Transport Service Operations at McChord Air Force Base. Shortly after Logair 41C landed at McChord Air Force Base, an individual identifying himself as a pilot on the Logair Aircraft called Basil Pepper, the Base weather station forecaster, and inquired if it would be possible to go VFR (Visual Flight Rules) from McChord Air Force Base to Boeing Field and then to Hill Air Force Base, Ogden, Utah. The caller was advised that over western Washington the general condition was 4000 scattered, 25000 broken cirrus and forecast to remain the same until 2:00 p. m. Then middle clouds at about 9—10,000 would appear and increase the remainder of the afternoon and slowly lower. Most of the Cascade Mountains to Pendleton, Oregon, there would be cirrus only, bases 25,000. Pepper also advised the pilot that the forecast winds at 3000 feet, to Boeing Field, were from 200° at 10 knots and from Boeing to Pendleton at 10,000 feet from 240° 5 to 10 knots. The pilot of Logair 41C was required by regulations, 14 C.F.R. 42.303, and by the air carrier, to certify, and did so certify within 60 days of the flight, that he was knowledgeable and had studied as to the subject route and airport:

(1) weather characteristics appropriate to the seasons;

(2) navigation facilities;

(3) communication procedures;

(4) kinds of terrain and obstruction hazards;

(5) minimum safe flight levels;

(6) pertinent air traffic control procedures including terminal area, arrival, departure, and holding and all kinds of instrument approach procedures.

3. Plaintiffs' decedents were flight engineers aboard the aircraft who were not trained for, nor responsible for, any navigational duties.

4. The aircraft departed from McChord Air Force Base at approximately 12:30 p. m., and arrived at Boeing Field at approximately 12:40 p. m. There is no evidence that the flight crew requested additional weather information prior to departure, when on the ground, or after departure, from Boeing Field, or through the Flight Service Station. Weather information is available at Flight Service Stations at all times and may be obtained by airborne aircraft, by radio. There is no aeronautical weather reporting facility at Mt. Rainier. There were clouds along the flights filed route, or actual route following departure from Boeing Field.

5. The flight was cleared for takeoff and departed Boeing Field on Runway 13 (magnetic heading approximately 130°) at between approximately 2:05 or 2:06 p. m. enroute to Hill Air Force Base. It was on a VFR flight plan at the time of departure. Aaxico Airlines prescribed a VFR route from Boeing Field to Hill Air Force Base which incorporated, inter alia, V4 airway to Yakima, Washington. It was the policy of Aaxico Airlines that its routes be flown VFR whenever practicable, reasonable, safe and efficient. Under Aaxico policy, it was the responsibility of the pilot operating VFR to maintain his own clearance of clouds, aircraft or obstructions, even if mo-

nitored by radar. The flight required no air traffic control clearance to fly VFR (pursuant to visual flight rules). The estimated time enroute from Boeing Field, to Hill, according to the flight plan was two hours plus thirty minutes.

6. There is no evidence that the aircraft, or its component parts, were inoperative or malfunctioning. The gross weight and center of gravity of Logair 41C, upon departure from Boeing Field, were within allowable limits. It was equipped with two very high frequency (VHF) navigation receivers which are used for navigation and which were found tuned, after the accident, to the Seattle VOR. After the accident, the VHF navigational receivers portrayed information that established the aircraft's position, at the time of the crash, to be on approximately 125° radial of the Seattle VOR. The aircraft was also equipped with distance measuring equipment (DME) which was found, after the crash, indicating the distance of the aircraft from the Seattle VOR as approximately 40.2 miles. The crew of Logair 41C possessed airway charts pertinent to the proposed route of flight. The Seattle airway navigation charts did not depict the location of Mt. Rainier. The Seattle area sectional chart depicted the location of Mt. Rainier (U.S. Exhibit 5).

7. Plaintiffs' factual and legal contentions concerned the performance, or the non-performance, of air traffic control duties and responsibilities. The essential facts, also admitted, included identification of the facilities involved in handling the flight, the personnel, and the times and content of communications which follow. At the Flight Service Station, specialist John Dodson was operating the inflight position from 8:00 a. m. to approximately 2:05 p. m. and from approximately 2:15 p. m. to 4:00 p. m. Assistant Flight Service Station specialist, Eugene Wells, was operating the inflight position from approximately 2:05 p. m. to approximately 2:15 p. m. Air traffic control specialist, Clifford Fay, was operating the D-2 (data) position at the Seattle

Air Route Traffic Control Center (ARTCC) from 2:02 p. m. to 3:06 p. m. Kenneth Rose was an air traffic control specialist at the center and was operating the R2 (radar) position from 2:02 p. m. to 2:55 p. m. Charles Schultz was an air traffic control specialist at the center and was operating the D-1 (data) position from 1:14 to 3:57. John Waldorf was an air traffic control specialist at the center and was operating R-1 (radar) position from 12:43 p. m. to 3:59 p. m.

8. The communications (radio) between the aircraft and the station were not recorded. All known communications (land line) between the station and the center were recorded. All known communications between the aircraft and the center were recorded.

9. Richard Keefe, who was the watch supervisor at the Flight Service Station from 8:00 a. m. to 4:00 p. m. received, at 12:44 p. m., a flight plan from McChord on Logair 41C which he wrote on a Form 398 flight plan at Logair 41C was a DC–6 aircraft, departing Boeing Field in a VFR flight plan to Hill Air Force Base. The flight plan was given to the inflight operator, Dodson, prior to 2:05 p. m. At the time of the departure, David L. Webster was working the local control position, in the Boeing Field tower, and the time of departure was communicated, on the interphone, from the tower to the Flight Service Station.

10. At approximately 2:11 p. m. the flight contacted the FSS inflight operator, Wells, who had relieved Dodson, and requested a radio frequency to contact center. At that time, Wells received a position report from the aircraft of 17 miles south. Wells contacted the center, sector 2D (Fay) at 2:11:36. The following were the communications between the Flight Service Station and the center:

2211:36 SEA FSS I have a logair four one charlie, eleven south of Seattle, wants a frequency.

| | | |
|---|---|---|
| 2211:41 | D2 | Four one, four one charlie? Which way is he going? Southbound? |
| 2211:47 | SEA FSS | Southbound I assume, he didn't say. |
| 2211:51 | D2 | Ok, if he's coming southbound, uh, put him on, uh, one two five point make it one two zero point, uh, no, make it one three three point five [2] |
| 2212:04 | SEA FSS | One three three five, alright, will do |
| 2212:06 | D2 | C D |

Logair 41C contacted the center R2 position at 2:13:01 p. m. and Kenneth Rose told Logair 41C to "stand-by" at 2:13:05 p. m. The exchange, according to stipulated Plaintiffs Exhibit 11 from the transcript of the tape recorded exchange, was as follows: [3]

| | | |
|---|---|---|
| * 2213:01 | 41C | Seattle Center, Logair four one charlie, on one thirty-three five, over |
| * 2213:05 | R2E | Logair four one charlie, Seattle, stand-by |
| 2213:08 | R2E | Alpha hotel zero four, turn right, heading zero four zero, stand-by for payne weather |
| 2213:13 | AH 04 | Roger, heading zero four zero |
| 2213:15 | R2E | United eight one four eight, Seattle Center, squawk code zero three zero zero |
| 2213:20 | UAL 8148 | United eight one four eight, code zero three zero zero |

| | | |
|---|---|---|
| 2213:24 | R2E | Roger |
| 2213:30 | ? | (Garble) have we got a Logair (Garble) |
| 2213:40 | R2E | United eight one four eight, Seattle Center, contact Seattle approach control, one one niner point five, over |
| 2213:47 | UAL 8148 | One nineteen five |
| 2213:49 | R2E | Roger, United eight one four eight |
| * 2213:51 | R2E | Logair four one charlie, Seattle Center, go ahead |
| * 2214:00 | R2E | Logair four one charlie, Seattle Center, go ahead |

11. At some time between 2:17 p. m. and 2:21 p. m.[4], Logair 41C contacted John Dodson, at the Flight Service Station, and filed an in-flight IFR flight plan. The crew gave its position as 33 nautical miles on Victor 4 climbing through 9000'. At 2:21:05 p. m. Dodson communicated the IFR request and position report to sector D2. At 2:21:19 p. m., Fay advised Dodson to have Logair 41C contact center on a sector 1 frequency, 120.3 for an IFR clearance [5]. At 221:32 p. m. Fay (D2) communicated to Schultz (D1) that Logair 41 Charlie is coming over to sector 1 frequency for an IFR clearance and that he was outbound on V4. At 221:53 Logair 41C called Waldorf (R1) and the following communications ensued:

2. The one three three point five was a radio frequency assignment on which the flight could contact the Center, sector 2 radar position. For the sake of continuity I find that after the initial exchange between the FSS and the center at 2211:36, that the flight was advised to contact the center, on 133.5, in a timely and expeditious manner.

3. Asterisk indicates transmissions from or to 41C; the remainder of the transcript is communication to and from other aircraft. For continuity I find that the call, by the center, to the flight at 2213:51 and 2214:00 was not received by the aircraft; further, under the evidence there is no way to determine whether the aircraft received the instruction to stand-by at 2213:05 and it cannot, therefore, be determined that two way communication was established between the aircraft and the center, at this time.

4. The flight service specialist testified that he recorded the time of 2:17, by estimating the time which he had not immediately recorded on the flight strip, after subsequent communication with other aircraft. This time was recorded at a time when he could not have known the aircraft had crashed. He also testified that he communicated with the center, concerning the request for an IFR clearance, without delay, which was recorded on the center tape beginning at 221:05. He testified that he received the report within a minute prior to initiating that communication. For continuity, I find that 41C conveyed the position report at or after 220:05.

5. This instruction was acknowledged by Dodson at 2:21:27. It is further found that this instruction was communicated in a timely and expeditious manner to 41C since the aircraft did, in fact, contact the center, R1, at 221:53, 26 seconds later.

| 2221:53 | 41C | Seattle Center, Logair four one Charlie, one two zero point three |
|---|---|---|
| 2222:01 | R1 | Logair four one Charlie, Seattle Center, loud and clear, go ahead, sir |
| 2222:04 | 41C | Roger, standing by for airways to hill field |
| 2222:12 | R1 | Logair, four one Charlie, roger, en route to hill field, and we don't seem to have your flight plan, uh, handy, uh, say again your requested flight plan |
| 2222:20 | 41C | Ok, victor four to Burley, victor one oh one Ogden, direct hill field, we asked for fifteen thousand |
| 2222:28 | R1 | Logair, four one Charlie, roger, do you have a transponder? |
| 2222:32 | 41C | Uh, negative, D M E |
| 2222:33 | R1 | Roger, what is your position now? |
| 2222:35 | 41C | Ok, we're up on the one two five degree radial, presently, thirty-nine miles out |
| 2222:49 | R1 | Roger, and that, is that from Seattle? |
| 2222:51 | 41C | Affirmative |
| 2222:57 | R1 | Roger, four one Charlie, what's your altitude now? |
| 2223:00 | 41C | We're climbing through ten point five, V F R |
| 2223:14 | R1 | Four one Charlie, roger, and what is your position with relation to, uh, Mount, uh Ranier? |
| 2223:29 | R1 | Logair four one Charlie, Seattle, what is your position with relation to Mount Ranier? |
| 2224:07 | R1 | Logair four one Charlie, do you hear me now? |
| 2224:33 | R1 | Logair four one Charlie, do you hear Seattle Center now? |
| 2225:08 | R1 | Logair four one Charlie, contact, uh, Seattle Center, one three two point six now for clearance, over |

12. During its communication with the Flight Service Station the aircraft gave two position reports. One was 17 south of Seattle, the other 33 miles (DME) out on Victor 4 (V–4) eastbound (the 102 radial of the Seattle). The third position report given was to the center at 222:35 "ok, we're up on the 125 degree radial, presently, thirty-nine miles out."

13. At 223:00 the aircraft reported "we're climbing through 10.5 VFR."[6] The aircraft crashed on the west slope of Mount Rainier at an altitude of approximately 10,-200′ at between approximately 2:23:00 and 2:23:18 p. m. The crash site was approximately 40.2 nautical miles on the Seattle VOR 125 radial. The crash site was not in controlled airspace. The first time that center received information that Logair 41 Charlie had left controlled airspace was 2:23:03 p. m. The crash site was not on an airway. The first time that center received information that Logair 41 Charlie was not on an airway was 2:22:51 p. m. Logair 41 Charlie was never issued an IFR clearance.

14. The actual route of flight of Logair 41 Charlie, after departure from Boeing Field, is not known. It must be found from the evidence or the reasonable inferences derived from facts themselves shown to be reasonably probable by a preponderance of the evidence.

### Findings On Disputed Facts

15. The controlling disputed fact requiring this court's determination is the flight path of the aircraft following its departure from Boeing Field. The plaintiffs contended its path was direct takeoff heading of 130°) to Victor 4, thence on Victor 4 (SEA 102° radial), thence direct to the crash site. Defendant United States contended the aircraft flew from Boeing Field direct to the Seattle VOR, thence to the point of impact, because, pursuant to U. S. Exhibit 7, compliance with the VFR flight plan prescribed by Aaxico Airlines required it to fly direct to the VOR. Alternatively, defendant United States contended that the evidence might show that it was more probable the aircraft did not fly direct to the VOR, but instead flew directly, on a heading of 125–130°, to the place of impact.

16. Captain Browne the Chief Pilot of Aaxico Airlines at the time of the accident, testified for plaintiffs. His testimony was

**6.** 10,500 feet.

to the effect that the aircraft did not fly direct to the VOR, but rather would fly outbound on runway heading to intercept Victor 4, if operating under visual conditions. Mr. Kincannon, the FAA investigator, testified that the aircraft was observed by him outbound on runway heading after takeoff. This was the only evidence on the subject except as to the two position reports given by the flight to the Flight Service Station. These are in conflict with the evidence which indicates that the aircraft if operated properly, and in accordance with the Aaxico, Inc. cruise control manual, U. S. Exhibit 1, at 1500 BHP, indicated airspeed 155 knots, would fly in 16 minutes to an altitude of 10,000 feet and to a distance of 39 nautical miles. In seventeen minutes the aircraft would climb to 11,000 feet and travel a distance of 44 nautical miles.

17. It was not within the discretion of the crew to use some power setting other than 1500 BHP (R. 665). There was no evidence that the aircraft was not operated in accordance with the cruise control manual. The distance from the end of the takeoff runway was established as 44 miles from the point of impact. Captain Browne testified as follows: (R. 673):

Q. Let me ask you this: Would it be fair to say, interpolating, would it be fair to say if an aircraft started his takeoff role and was off the ground 45 seconds later and flew for about 17 minutes and 15 seconds, that it would have traveled approximately 44 air miles after leaving the ground?

A. With climb airspeed, yes.

Captain Browne also testified, with regard to deviation from a direct route of flight, as follows:

Q. Now, do you have any information that this aircraft crew deviated from a direct route of flight intercepting the 130 radial and flew thereafter to the point of impact at the mountain a distance of roughly 44 miles?

\* \* \* \* \* \*

A. I would say yes.

Q. What information do you have?

\* \* \* \* \* \*

The Witness: All right, they were on the 33 DME, reported as such. The next report, the coming up on the 125 radial, which shows a deviation from Victor 4.

Q. Do you have any other information?

A. Negative.

Q. On the other hand, do you have any other information except that which you mentioned, that they reported 33 DME on the 120 radial? Do you have any information that suggests they did not fly a straight line covering approximately 44 miles in 18 minutes from the time of takeoff roll?

A. Negative.

18. This testimony does not permit the conclusion that the aircraft crew reported its position properly at either the 17 mile position, south of Seattle, or the 33 mile position on Victor 4. The only permissible conclusion is that the pilot headed straight for Mt. Rainier and never deviated until he hit. The computation of the time, in my opinion, is just irrefutable. The testimony otherwise elicited from plaintiff's expert witness, as to the longer route of flight with deviations, was in response to hypothetical facts and premises, which were not supported by the evidence. The aircraft crashed within a period of 17 minutes to 18 minutes 15 seconds after takeoff at an altitude, and at a distance, where it would be placed by the information contained in the cruise control manual.

19. It being found that under the evidence the flight path was direct from Boeing Field to the point of impact, we now turn to the issues of disputed facts established by the parties. Certain of the factual issues have no bearing on this court's decision, and are found to be irrelevant and immaterial, i. e., whether or not the flight was on an airway or in controlled airspace immediately prior to the impact, whether the aircraft was equipped with radar, the extent of the visibility at Seattle, Mt. Rainier, or in between, except to the extent that the aircraft entered IFR conditions, having left VFR conditions, at some point in the

flight, probably not far distant from the impact area and continued so to the time of impact. It is also unnecessary to determine whether the flight crew possessed sectional charts pertinent to the proposed route of flight, since Captain Browne testified none was required but that the crew was required to know of the location of Mt. Rainier. Likewise, the finding, infra, that there were no acts or omissions of the air traffic personnel that constituted a violation of procedures, or the applicable standard of care, would make meaningless any finding as to whether Logair flights were conducted daily, or handled daily by air traffic control, on flights between Boeing Field and Hill AFB.

20. Additional factual questions remain which, if decided by this court are peripheral to the principal finding that the accident was caused by the negligence of the flight crew and not any act or omission of Air Traffic Control personnel.

21. Plaintiffs contended that the existing weather at Boeing Field at the time of Logair 41C's departure was cloud cover such that Logair 41C had to alter from its filed route of flight to maintain VFR. Defendant United States contended that cloud cover changes between the time of the weather briefing at McChord and 41C's departure from Boeing Field were evidenced by an approach of a forecast frontal system. Clouds and weather in the Seattle area were readily observable to the aircraft crew. Captain Frank Chase testified that he departed Gray Field, south of Seattle under visual flight conditions awaiting an IFR clearance at approximately 2:40 p. m. His route of flight, to Yakima, was north of Mt. Rainier. His observations were that the weather had deteriorated, after noon, and at the time of his departure were overcast, the base of the clouds at an estimated altitude of 3500 to 5000 feet, also Mt. Rainier was becoming obscured. After receiving his IFR clearance, he entered the clouds and at one point, between layers, observed Mt. Rainier approximately 15 miles distant. Otherwise, except after passing beyond Mt. Rainier the clouds were solid up to and

including 11,000 feet. He stated that VFR flight was possible, under the clouds, up to an altitude of approximately 4500 feet. Mr. Kincannon, who observed the departure of the Logair 41C stated that the weather deteriorated rapidly shortly after noon and the sky became very overcast and very dark underneath, to indicate thick clouds. He estimated the base of the clouds in the vicinity of the Boeing Field at the time of the departure of 41C as 5000 feet. The contentions of the parties are not substantially different, only that to the extent there was cloud cover plaintiffs assume that the flight altered its route to maintain VFR. This is, however, without substantiating evidence. Plaintiffs also contended that the weather changes, if any, as to clouds, at altitudes above the surface, en route or in the vicinity of Mt. Rainier were not clearly observable to the crew of the aircraft between the time of takeoff and the happening of the accident. In view of the credible observations of the persons who observed the weather conditions, and the testimony of Captain Browne that such changes in the weather would be observable to a qualified airline pilot, it is found that the changes, if any, were in fact clearly observable to the crew of 41C.

22. The logical, reasonable, and compelling conclusion to be derived from the evidence as to weather conditions at Seattle, Mt. Rainier, or between, together with the finding that the aircraft proceeded directly from a point of takeoff to the point of impact requires the further conclusion that the flight penetrated clouds along its actual route of flight which obscured Mt. Rainier. Although the flight encountered, and penetrated clouds, constituting flight in visibility conditions less than the minimums prescribed for flight pursuant to visual flight rules (14 CFR 91.105) it did not, after departing from Boeing Field report any emergency requiring immediate action, despite the existence of the ability to communicate. The duty to remain clear of clouds and obstructions rested solely with the aircraft crew. Indeed, Captain Browne testified that if, assuming, the pilot could see the mountain, there would be no reason to ad-

vise the pilot of the proximity of the mountain (R. 850–853). He further testified that to fly under VFR and to strike Mt. Rainier, because he did not know where it was, would be a gross violation of the standards of care, skill, judgment, and responsibility imposed by Aaxico Airlines, and that the only way that could occur, and not be wilful, would be if the crew was unaware of the location of Mt. Rainier (R. 732–740). Certainly, it is illogical to conclude, or even argue, that air traffic control personnel should perceive, or foresee, the consequences of a wilful or grossly negligent act. In contrast, Captain Browne would not admit to the requirement that a crew advise air traffic control of anticipated loss of visual flight conditions (R. 837). Under the factual circumstances, found, and any other hypothetical circumstances developed in this case, I find there was no duty on the part of air traffic control personnel to issue advisories, warnings or cautionaries to aircraft of proximity to obstructions when under all known circumstances it could only be anticipated that the operation is regular and in accordance with applicable regulations and standards. I specifically find, in the instant case, there was no requirement to warn or foresee the need for a warning, advisory or cautionary, and that there was no evidence of realization of impending danger on the part of air traffic control personnel.

23. The remaining factual issue, i. e., in what capacity were the decedents acting as flight engineers aboard Logair 41C, may be decided by referring to Plaintiff's Ex. 1, the Military Flight Plan, Form DD–175. It shows the decedents assigned as Flight Engineer Crewmembers. No evidence to the contrary was received in evidence. I find the decedents were flight crewmembers.

24. The evidence, with regard to the question of whether or not Mr. Wells was required to ascertain the exact position and direction of travel of Logair 41C after the initial contact, at approximately 2:11 is resolved by the evidence which indicates that the aircraft reported its position, and further verification was not required, and since no control of the aircraft was contemplated by the Flight Service Station, verification of the direction of travel was not required under the circumstances.

25. The question of whether or not the aircraft was within jurisdiction of Sector 1 or Sector 2 between the times of 2:11 and 2:23 was raised by plaintiffs. Under testimony, the location of the aircraft was, by its position report at 2:11, within Sector 2. The fact that it was not could not be relevant to the question of whether the service requested was, under those circumstances properly performed. I find that the assistant flight service specialist (Wells) obtained and delivered a frequency as requested. Thereafter, between 2:20:05, and 2:21:05, the aircraft again contacted the Flight Service Station (Dodson). Its position report, because of the finding as to the route of flight, given as 33 DME on V4 was erroneous. At that time it was, according to the evidence in Sector 1, but had recently traversed a portion of Sector 2. The only significance to this issue was the allegation that if Dodson had called Sector 1, instead of Sector 2, that the accident might have been averted. I find, however, that under the preponderance of the evidence the communications did not delay the issuance of a clearance since Sector 2 instructed that the aircraft be told to call Sector 1 directly, which did not increase the communication relay time, rather, if anything, it eliminated communication relay delay.

26. The plaintiffs sought a finding that the Form 398 flight plan was available to Wells during the time he operated the inflight position. This finding apparently was sought so that it could provide the foundation for knowledge that the aircraft would proceed towards, or traverse Sector 1 although it reported its position in Sector 2. The totality of the evidence indicated that a VFR flight is not required to abide by the route described, further that such a flight plan is used for search and rescue operations, not to control air traffic. Aside from the fact that the issue was remote in time to the accident, it cannot be held to be either constructive or actual notice to any-

one in the air traffic system which would require interrogation in the nature of cross-examination by a flight service communicator. I find that the Form 398 was available but that it was not required to be used or obtained by Wells in consequence of the request for a center frequency.

27. Plaintiffs contend that Dodson (FSS) was required to communicate to Fay (D–2) the requested flight plan. This was received by Dodson during the minute 2:20:05 to 2:21:05. If given by Dodson to Fay, he would then have to relay it to Schultz (D–1), then Schultz to Waldorf (R–1). To say that the circumstances, wherein the aircraft had reported no emergency or the penetration of IFR conditions, and where all could assume the aircraft was VFR, that the alternative of establishing direct communication between the aircraft and R–2, which occurred expeditiously, is to stretch the bounds of reason. I find that the provisions of the Air Traffic Control Procedures Manual, AT P 7110.1B, Ex. P–9, the Facility Operation Manual P–8, the Flight Assistance Service Manual, U.S. Ex. 2, and the Communications Procedures Manual AT P 7300.1A, as documents which circumscribe the duties and responsibilities of air traffic personnel do not impose such narrow specifications of the performance of air traffic control duties that no latitude is available to the individual to accomplish the objectives. In this case, it cannot be said that the relay of communications with regard to the flight plan was improper under the circumstances known to the personnel and I specifically find that the flight service specialist was not required to communicate the requested flight plan where it could have been communicated expeditiously to the proper sector by the flight crew.

28. The remaining factual contentions of plaintiffs are related to the requirement to advise, caution, or warn 41C of its position with relation to Mt. Rainier, or in another perspective whether the personnel should have realized the flight was in impending danger at 43 seconds prior to impact, or at one minute and six seconds prior to impact. These contentions suggest an incomprehensible degree of human perception or clairvoyance. No information was transmitted by the crew suggesting the existence of extraordinary conditions, 14 CFR 559(a), or any encounter with unusual, severe, or unforecast weather conditions, 14 CFR 121.561.

29. Under the foregoing circumstances, plaintiffs contended that when the pilot reported, at 2223:00 that he was ". . . climbing through ten point five, VFR" that he "thought" that he was operating in visual flight conditions. This can be construed only as a representation that the flight was in visual flight conditions. It can be concluded only that to the extent the statement was meant to infer operations in visual flight conditions it must have been, considering the happening of the accident several seconds later, a misrepresentation. Plaintiffs also contended that the aircraft could not have altered its flight path to remain VFR at all times. This cannot be the case since the evidence, through the testimony of Captain Chase indicates that the weather conditions below 4500 feet between Gray Field and Mt. Rainier permitted VFR flight below that altitude anywhere in that area, and the testimony of Mr. Kincannon indicated that the base of the clouds in the Seattle area was approximately 5000 feet. It can only rationally be concluded that an alternative to intentional flight in instrument flight conditions was available.

30. The factual issues with regard to the performance of air traffic control duties and responsibilities included the question of whether or not Mr. Wells, who relieved Mr. Dobson for a period of ten minutes between 2:05 and 2:15 p. m. was required to be under direct supervision during the time he operated the inflight position at the Flight Service Station. The only direct evidence on this question was the information contained in the facility operation manual, 7230.1A, paragraph 124, plaintiff's exhibit 8. A portion of that paragraph provides "Assistant Flight Service Specialists shall not be regularly assigned to professional specialists duties but, if qualified, may be

assigned such duties for short period during emergencies or if a temporary staffing shortage develops at a facility." The evidence was that Mr. Wells was qualified in the position and the circumstances justified the short relief provided by his performance at the position.

## CONCLUSIONS OF LAW

### Crew Negligence

 1. The crew of an airline transport are required to conduct their operations pursuant to applicable regulations, the Federal Aviation Regulations, 14 C.F.R. 1 *et seq.*, and the Federal Aviation Act, 49 U.S.C. 1301, *et seq.*, good operating practices, and the procedures imposed by the airline itself. They are continuously required to demonstrate the levels of care, skill, judgment and responsibility required to operate a large aircraft in air commerce or air transportation. The crew of such an aircraft is bound by the overall provisions of Part 121 of the Federal Aviation Regulations, 14 C.F.R. 121.

2. Paragraph 121.657(b) precludes a supplemental air carrier from operating any aircraft under VFR during the day at an altitude less than 1,000 feet above the surface or less than 1,000 feet from any mountain, hill, or other obstruction to flight.

3. Airline transport pilots are also required to abide by the provisions of 14 C.F.R. 91, which constitute the general operating and air traffic regulations. Section 610(a) of the Federal Aviation Act, 49 U.S.C. § 1430(a), provides that "it shall be unlawful—(5) for any person to operate aircraft in air commerce in violation of any other rule, regulation, or certificate of the Administrator under this title . . . ."

4. In sum, the duty of an airline transport crew is circumscribed by the foregoing regulations and the procedures imposed by the carrier, along with good operating practices. In the context of this case the crew was required, by regulation, to obtain updated weather information prior to departure, 14 C.F.R. 91.5, 121.599(b), to be aware of obstructions, including Mount Rainier, 14

C.F.R. 121.445, to be able to operate the aircraft navigation radio equipment and to use other elements of navigation, and by Aaxico, to operate on airways or approved VFR routes which were specified by Aaxico.

5. The crew was obligated, by Aaxico, as well as regulations, to be responsible for the separation of the aircraft from other aircraft, and obstructions, while operating under visual flight rules; to operate the aircraft at a safe altitude; to remain clear of clouds or, in the case of inadvertent entry, to retreat immediately; to make a personal observation of the weather conditions prior to departure and in the event unusual, severe, or unforecast weather conditions were observed on the route of flight to report the same to air traffic control. AIM, US Ex. 4 II–17, Communications, Position Reporting, Subpara. J., 14 C.F.R. 121.561. The crew was obligated to report any emergency requiring any immediate action to air traffic control. 14 C.F.R. 559(a). Also to keep the appropriate ground radio facility advised of the progress of the flight. 14 C.F.R. 559(c). The crew was required to give accurate position reports. AIM, supra, US Ex. 4, II–16 Subpara. a.

6. Airman's certificates are issued pursuant to the provisions of Section 602 of the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1422. The regulations governing the utilization of airman's certificates, and air carrier operating certificates, issued pursuant to Section 604 of the Federal Aviation Act, 49 U.S.C. § 1424, are promulgated pursuant to Section 601, 49 U.S.C. § 1421, where it is stated in subsection (b), "that in prescribing standards, rules and regulations, and in issuing certificated under this title, the Administrator shall give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety . . . ." The standard of "highest possible degree of safety" is utilized in the issuance of certificates to supplemental air carriers which, at the time of this accident, included Aaxico Airlines. The regulations governing issuance begin at 14 C.F.R. 121.-

**484**

·41 and provide, at 121.51, that an applicant is entitled to a certificate if the Administrator determines that the applicant is properly and adequately equipped and able to conduct a safe operation in accordance with the requirements of this part and the operations specification provided for in this part (121); and further provides at 121.53, that a certificate, if issued, may be suspended or revoked for any reason which, at the time of application, would have been grounds for denying an application.

7. The provisions of 14 C.F.R. 121.59 provide that the applicant must show that it has enough qualified management personnel to provide "the highest degree of safety in its operations". The carrier is required to provide a manual, for the use and guidance of flight and ground operations, pursuant to 14 C.F.R. 121.133(b); and such manual requires inclusion of "instruction and information necessary to allow the personnel concerned to perform their duties and responsibilities with a high degree of safety". 14 C.F.R. 121.135(a)(1). Considering, the foregoing imposition of the highest degree of safety upon the air carrier, the question is whether the airline operations must be carried out in accordance with the highest degree of safety by its employees. Captain Browne acknowledged (R. 463) that the concept applied to the pilots of Logair 41C as a concept in the operation of a supplemental air carrier:

Q. Did such manual include instructions and information as necessary to allow the personnel concerned to perform their duties and responsibilities with a high degree of safety?

A. Yes, sir.

Q. And did that include you? The personnel concerned, did that include you at the time?

A. Yes.

Q. And did it include the pilots of the aircraft called Logair 41 Charlie?

A. Yes.

Q. Without any question?

A. There is no question of the regulation, sir.

Q. All right, but is there any question as to whether or not they were required to perform their duties in accordance with the highest standard or degree of care?

A. No, sir.

Q. As a concept in this business, in the operation of a supplemental air carrier?

A. That is correct, sir.

8. If there was a federal standard of care applicable to this tort action in the State of Washington, I would indeed apply the highest degree of care in determining these issues; however, this does not become necessary in my deliberations which otherwise find, considering the duties imposed upon the crews of air carriers, a gross, or even wilful, violation of the ordinary standard of care.

9. The record is abundantly clear, primarily through the cross-examination of Captain Browne and the examination of the recorded transcripts of communications, Plaintiff's Exhibits 10–13, that most if not all of the foregoing regulations or procedures were disregarded by the crew of 41C. The crew failed to operate the aircraft pursuant to VFR in visual flight conditions, failed to maintain clearance from clouds and obstructions, failed to observe apparent weather conditions, and failed to navigate the aircraft, the result of which was the impact with Mt. Rainier. Reliance on air traffic control for separation from obstructions, or for navigational assistance, was not in the premises in any way justified. The crew made no report to air traffic control which would convey any sense of urgency or emergency, with respect to the safety of operation.

■ 10. The case law is incontrovertible that an aircraft operating pursuant to visual flight rules must provide its own navigation and clearance from obstructions. The duty to operate the aircraft, and to navigate, is assigned to the pilot who must provide his own separation from obstructions, and other aircraft, while in VFR conditions. *Hamilton v. United States,* 497 F.2d 370 (C.A. 9, 1974) *aff'd,* 343 F.Supp.

426 (N.D.Cal.1971); *Ross v. United States,* 365 F.Supp. 1138 (U.S.D.C. Vt., 1972) *aff'd,* 486 F.2d 1396 (C.A. 2, 1973 no opinion); *El Paso Natural Gas Company v. United States,* 343 F.2d 145 (C.A. 9); *United States v. Miller,* 303 F.2d 703 (C.A. 9, 1962); *United States v. Schultetus,* 277 F.2d 322 (C.A. 5). The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to the operation of the aircraft. 14 C.F.R. 91.3. Although it is held that the duties of the pilot and of the controllers are concurrent, *Miller, supra,* the operational control of the aircraft is not, in any case, assigned to air traffic control. This is assigned to the air carrier and the pilot in command. 14 C.F.R. 121.537. Particularly applicable is 121.537(d), which assigns to the pilot in command the responsibility, during flight time, for the safety of the passengers, crew members, cargo and aircraft. 121.537(e) assigns to the pilot in command the responsibility for the pre-flight planning, and 121.-537(f) provides that no pilot may operate an aircraft in a careless or reckless manner, so as to endanger life or property.

## Government Negligence

■ 11. The duties and responsibilities of air traffic personnel are circumscribed by the Procedural Manuals [7] in accordance with the standard of due care. Although plaintiffs attempted to broad brush the elements of duty and responsibility by referring to the prosaic characterization of the functions as set forth in the United States Civil Service Classification Series for Air Traffic Control plaintiffs Exhibit 15, it is held that this document does not establish assignment of duty and function to an air traffic control specialist.[8] Its general description of function must be interpreted only in consideration of the duties assigned. Plaintiffs further sought such narrow interpretation of manual provisions that it could be said that the slightest deviation from prescribed terminology, practice,

or procedure could be assessed as negligence per se. This cannot be subscribed to by this court. The function of providing air traffic control service incorporates the elements of judgment and discretion in the handling of many thousands of different situations, and since the elements of judgment and discretion may be more relevant in any given situation than the express provisions of the manual, it is impossible to say even that failure to follow express provisions of a manual constitutes negligence, let alone negligence *per se.* Thus the characterization of the procedural manuals as the "Bible" of air traffic control; or as "regulations having the force of law" is equally unacceptable, since the manuals are not promulgated in accordance with legislative or administrative procedures for enactment of law or regulation. The manuals may be explicit in one instance and afford wide discretion in another. This is not to say that the manuals, to the extent they assign duty or function, with or without discretion, should not be used, with the relevant facts, as in the case of any employee, to determine the scope of duty.

■ 12. In the instant case, and assuming the function of air traffic control to issue clearances and provide separation to IFR aircraft, the primary issue is whether a duty existed, at any time in the premises, to issue an air traffic IFR clearance to 41C or to warn the aircraft of its endangerment. Factually it is held that under the circumstances there was no violation of air traffic procedures, or even if there were, such violations could not have been a proximate cause of the accident. This finding is consistent with existing law which recognizes that the duties resting on pilots and controllers may be concurrent, but not overlapping, and that here, before a duty can be imposed upon a controller, where the objective is to assess liability for failure to issue a clearance, it must be found that the controller is aware of those facts which are

---

7. Exhibit's P.–8, P.–9, U.S. Exhibit 2.

8. "This document does not assign duties to the air traffic controller. It is not used as a guide

by the controller in the control of traffic." *Voce v. U. S.,* USDC, N.D.Cal., Zirpoli, J.Civ. No. C–51163–AJZ, 3/12/74.

material to the performance of the duty. In this case, the facts, which normally are used in the formulation of a clearance, were diligently obtained by the R–1 controller. However, no information was voluntarily furnished to the controller which imposed a condition of timeliness in the urgent sense suggested by plaintiffs. Even in an emergency the duty of care is only that of ordinary care. *Spaulding v. United States,* 455 F.2d 222 (C.A. 9, 1972) *sub nom., Michelmore v. United States,* 299 F.Supp. 1116 (USDC, C.D.Cal., 1969). *Miller* supra. 14 C.F.R. 91.5.

■■■ 13. To the extent that any duty exists the controller has the right to rely upon the assumption that the pilot knows and will abide by all applicable Federal Aviation Regulations. *Crossman v. United States,* 378 F.Supp. 1312 (USDC Or., 1974). In *Crossman* it was held, as it is here, that since the aircraft was "VFR" and the rules require the pilot to be aware of the obstructions, or the danger, as the case may be, either from keeping a careful lookout or from the markings on aeronautical charts, that the controller has no duty to warn.

14. Even if, *arguendo,* it could be said that a duty to warn could exist under specified facts, here the fact that no employee of the Government was aware of the endangerment of Logair 41C, at any time, or of any of the other circumstances that may have contributed to its endangerment, precluded the existence of any duties with respect to that flight that could have been breached, including duties to warn, assist, or advise.

■■■ 15. Whether or not an air traffic controller is required to warn an aircraft, under any circumstances, is determined by law, or is a mixed question of law and fact. Whether an aircraft is in "known" danger is a matter of fact, but no duty exists to warn an aircraft of a danger of which the crew is already aware, or of which it should be aware. This includes the operation of an aircraft below minimum obstruction clearance altitudes, off airways, and in uncontrolled airspace under instrument weather conditions without an IFR clearance. No warning is required with respect to an obstruction which can be, and is, easily observable to the crew of an aircraft. No duty is imposed upon controllers to warn pilots not to enter IFR weather conditions without a clearance, nor are they required to foresee or anticipate the unlawful or negligent or grossly negligent acts of pilots.

16. Plaintiffs suggested in their trial brief, although it was not incorporated in the pre-trial order, that the air traffic controllers had the last clear chance to avoid this accident. This argument is, under the facts, illogical. The argument must assume, first, that the aircraft crew cannot see the mountain, which proves prior gross, willful or intentional negligence of the crew, in entering the IFR conditions which would have prevented their seeing the mountain. Next, knowledge of this by the controller would be required, not only of entry and emergency, but also of the heading of the aircraft, which was not given. Otherwise, it would be a paradoxical situation indeed if the controller were required, when the pilot could not see the mountain, to tell it to turn to the right, or to the left, from a position of unknown heading or course. This burden cannot be placed upon air traffic control nor can a duty be imposed upon the system which would require specific action to extricate the aircraft from an emergency situation where operational control of the aircraft cannot be transferred to a person on the ground.

SUMMARY OF ORAL DECISION SEPTEMBER 6, 1974 INCORPORATED BY THIS REFERENCE IN THE FINDINGS OF FACT AND CONCLUSIONS OF LAW

■■■ The law of the place of the accident governs in actions brought pursuant to the Federal Tort Claims Act. 28 U.S.C. § 2674. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961). Pursuant to the law of the state of Washington, it is fundamental that there can be no recovery of damages, in Tort, unless a plaintiff proves first, that the defendant

against whom the action is brought had a duty to exercise reasonable and ordinary care for the safety of the plaintiff; secondly, the plaintiff is required to establish a breach of such legal duty by the defendant; and third, that such breach of legal duty by or chargeable to the defendant was the proximate cause of the injury or damages claimed in the particular case.

 Under Washington law, the plaintiff has the burden of establishing both negligence and proximate cause. *Ferrin v. Donnellefeld,* 74 Wash.2d 283, 444 P.2d 701, 702 (1968); *Wenzel v. United States,* 419 F.2d 260 (3rd Cir. 1969). Substantial evidence is required, a mere scintilla is not sufficient to support a finding of either negligence or a proximate causal relationship between negligence of the defendant and the injury or death of those for whom damages are sought. *Ross v. Great Northern Railway Co.,* 315 F.2d 51 (9th Cir. 1963); *Wilson v. Northern Pacific Railway Co.,* 44 Wash.2d 122, 265 P.2d 815 (1954). Proof of negligence and proximate cause do not have to be established beyond a reasonable doubt, nor by any more than a preponderance of the evidence, but proof of negligence and proximate cause cannot be determined solely on conjecture or speculation as to any fact necessary to establish a causal relationship, *Carley v. Allen,* 31 Wash.2d 730, 198 P.2d 827 (1948); *White v. Greyhound Corporation,* 46 Wash.2d 260, 280 P.2d 670, 672–3 (1955); *Ross, supra;* and where, on the evidence, under one theory of the case plaintiff would be liable and under another theory not liable, plaintiffs' burden of proof has not been met. *Gardner v. Seymour,* 27 Wash.2d 802, 180 P.2d 564, 569 (1947); *Ross, supra.* Reasonable probability, not mere possibility, that the deaths of the plaintiff decedents in these cases were proximately caused by defendant's negligence is an essential element for recovery by the plaintiffs. In Washington law it is a well recognized rule that inferences based on circumstantial evidence may be sufficient to establish proximate cause, but the evidence must reasonably exclude any proximate cause other than that of negligence chargeable to defendant.

 Under Washington law, it is well established that the degree of care required of air traffic controllers is that of ordinary care, or the duty to exercise due diligence, which is substantially the same thing, even in an emergency. *Spaulding v. United States, supra.* The duty of the pilot in this case will be deemed that of exercising reasonable care. A violation of specific duties and responsibilities prescribed by pertinent manuals, established practices, or regulations constitutes negligence in itself; if done intentionally, deliberately and in disregard of manual requirements it would be willful and amount to what, in Washington law, is called gross negligence.

 The pilot is directly responsible for and has the final authority for operation of the aircraft he pilots. *Spaulding, supra.* It is the general rule in the State of Washington that a passenger in a vehicle may recover from a negligent third party even though the operator of the vehicle in which the passenger was riding was also negligent, which negligence proximately caused or contributed to causing injury or death to such passenger. I assume, without deciding in this case, that this statement is applicable to plaintiffs' decedents. It is not decided because under Washington law, passengers in vehicles who know, or in the exercise of reasonable care ought to have known, that the vehicle was being negligently operated or in willful violation of the responsibilities of a driver, cannot recover by reason of contributory negligence. In this case, I do not think it necessary to go into the circumstances or to make a decision upon that subject; that is, whether or not one or more other occupants in the plane who were not piloting it, should under the particular circumstances of this case, have recognized that something was seriously wrong with the way the pilot was operating the aircraft. They were all experienced flight crew members, aware of the distance that the plane had traveled, and it may well be that in the circumstances negligent operation of the plane could not have escaped their notice, and therefore, they could not

recover because of their failure to warn the pilot or to take measures to correct whatever was improper in the management and piloting of the aircraft.

The foregoing statements are the principal propositions of law to be applied in determining this case. No other particularly important or significant concepts of law need be specifically mentioned herein in the particular circumstances presented by the evidence.

I have never piloted a plane although often in the cockpit of a plane in flight, especially while in military service during World War II, and have traveled by air many hundred thousands of miles in many areas of the earth. This does not give me any expertise in running a plane, but it certainly fills me with the most emphatic conviction that anyone who is responsible for the operation of a plane, whether it is a controller in a traffic center or a pilot or whoever it is, who fails to do that which reasonable care requires should not be excused from his negligence, and if it was negligence which proximately caused this tragedy that we are now concerned with, I would not hesitate for one moment to impose whatever penalty in damages or otherwise the circumstances might justify.

Now, having said that, I must add that neither controllers in the air traffic centers nor pilots are required to do anything more than exercise ordinary and reasonable care. In other words, neither a pilot nor a controller is a superman. Each has a high degree of expertise and must have to qualify for either position, but in the last analysis, the standard by which they must be judged is that of ordinary and reasonable care. Ordinary and reasonable care does not mean the highest degree of care in the law of Washington. Washington recognizes the highest degree of care, and also a slight degree of care. In between is reasonable and ordinary care. For many years I have been aware of this in conducting many Tort cases both as a lawyer and as a judge. Thus, in each situation when a claim is asserted, negligence on the part of a pilot or on the part of a traffic controller in whatever position he may have been occupying at a given time, the standard of his duty is to exercise reasonable and ordinary care. In enforcing that standard, all of the facts and circumstances existing at the particular time the individual was acting must be considered and taken into account. A judge cannot divorce himself from all the surrounding circumstances and make a finding based upon a response to a hypothetical question when the witness making the response apparently disregards the particular facts and circumstances shown by the evidence. Nor can he require an exercise of greater than reasonable care; namely, what appears to be reasonable in the mind of the person acting at the time in the exercise of reasonable care.

Counsel on both sides of this case in my judgment have performed their professional responsibilities in keeping with the highest standards of our profession. It is clear that the plaintiffs' counsel have undertaken extensive, exhaustive and meticulous efforts in discovering available evidence and in presenting their case have developed ingenious approaches based on the available evidence, and so has counsel for the defendant. It must have been obvious to plaintiffs' counsel from the beginning that there was a vast amount of nonavailable information concerning what happened on April 23rd of 1965 in the final flight of Logair 41 Charlie. That must have been apparent to plaintiffs' counsel and it certainly is indisputable from the evidence in the record. There is gap after gap in the evidence which, if presented, would have provided very helpful information, to put it at a minimum, as to what occurred or did not occur on the flight.

In my considered opinion, there are so many highly significant facts pertaining to the actual course and maneuvers of flight 41 Charlie, especially during the relatively short period prior to its impact on Mt. Rainier upon which there is no evidence whatsoever, other than assumptions, conjectures, and speculation, largely presented in hypothetical questions or in answers thereto, that it is impossible to determine to any degree of probability, let alone reasonable

probability, by a preponderance of the evidence, the ultimate questions as to either liability or proximate cause.

In short, in my judgment there is no evidence presented in this case to establish liability other than speculation, as distinguished from reasonable inferences derived from facts which themselves have been shown to be established and credible by a preponderance of the evidence.

On the evidence in the case considered as a whole, this court as the trier of the facts must find that in reasonable probability the crash of flight 41C was proximately caused solely by the error and negligence of the pilot and co-pilot in violating their responsibilities and duties as prescribed by aviation manuals and established in various other particulars. We know for certain, at least I believe for certain, one, that the pilot headed straight for Mount Rainier and never deviated until he hit it. The computation of the flight time in my opinion establishes this fact irrefutably. It is like the old saying, "you can't get there from here" with a DC6 having the capabilities of the plane in question other than in about 18 minutes. It is clear that the plane went to the altitude that it did because the wreckage of the plane at that altitude. We know where it hit with absolute certainty. Secondly, within that very small range of time tolerance as to when the plane impacted the mountain, whether it was anywhere from 16 to 20 minutes, it was a very small tolerance, and in my judgment it is certain that there was no time available for the plane to dodge about; in other words, to deviate from a direct and straight flight to the impact to any significant extent. I think it is certain that the pilot left VFR and entered IFR at some point in the flight, probably not far distant from the impact area, and continued so to the time of impact. In all the known and significant circumstances, that must be held to be gross negligence. Indeed, so far as the evidence is concerned, there is no apparent or rational justification for it, which in Washington law constitutes gross negligence, especially since an experienced air transport pilot, un-

der the compulsion of not leaving VFR, would not do so except in remarkable and incredible circumstances. Remarkable circumstances are not indicated in the remotest way. They were never reported to the traffic center. There is no evidence which would authorize this court to assume the hypothetical facts that were given to Captain Browne, namely, that this flight dodged around from here to there before it reached the point at which it crashed.

Another significant fact is that the pilot never at any time reported anything remotely indicating he was proceeding other than VFR. As far as personnel at the air traffic control center were concerned, they were entitled to assume the pilot was VFR and rely thereon until he notified them to the contrary. The law on that is indisputable. Finally, the flight pilot reported his position and altitude as being such that it must have been grossly inaccurate. Whether that was due to instrument failure, negligence or otherwise it is impossible to determine, but in my judgment, it is an undisputed fact shown by the evidence in this case. At a minimum, the trier of facts, whether a court or a jury, could not possibly determine by a preponderance of the evidence this court finds credible and not speculative, or with any degree of reasonable probability what any other possible proximate cause or causes of the crash may have been. Each alleged manual or practice violation alleged in this case, in all of the existing circumstances, is a question of fact and not a question of expert opinion or a matter of law. Any delay, irregularity, failure of strict compliance with the relevant manuals or other deviations from prescribed FAA practice and procedures, which might reasonably be found to constitute negligence, has not been shown by a preponderance of the evidence to establish with reasonable probability that such negligence, if any, was a proximate or contributing cause of the crash in question.

In my judgment, considering all the circumstances in each instance claimed by plaintiffs to be a violation, with reasonable consideration of what reasonable care re-

quires, not one could reasonably be found a violation. Even if there were any one or more of them that did amount to negligence, I am totally satisfied it did not proximately cause the casualty in question.

It is my practice to briefly state my evaluation of the credibility of witnesses. Inasmuch as plaintiffs' case is largely established or falls upon the testimony of Captain Browne and Mr. McDermott, I must evaluate their testimony and state my reaction to it. Captain Browne's admissions on cross examination in several vital particulars, standing alone, would preclude a finding of liability in this case. On non-critical matters, Captain Browne's testimony was reasonable and credible, but on crucial matters his demeanor and reluctance to answer damaging questions, doing so only after protracted cross examination, greatly impaired the credibility of his testimony. I certainly do not agree at all with his opinion evidence as to what happened to the plane in question prior to its crash.

To even a greater extent, I find the testimony of Mr. McDermott unacceptable and incredible. In the first place, his demeanor, his manner, and the substance of his testimony clearly were those of an advocate rather than a reasonably objective expert. This was constantly demonstrated during his testimony. His responses to hypothetical matters, clearly unsupported by the evidence, based on wholly extraneous circumstances in which hope or expectation was substituted for reason or as a foundation for asserting that the court must find manual violations upon extreme and strained interpretation, "but for" which the crash in question would not have occurred. This court, in good conscience cannot substitute McDermott's "but for" reasoning for determination of the issues upon legal principles applicable to the duty owed, breach thereof and proximate cause.

On the other hand, I find the testimony of defendant's experts, at least in all significant particulars, credible and acceptable. True, they were both government employees. I had that in mind in determining whether there appeared to be overstretch-

ing or understatement in favor of the government. Not once did that occur in the testimony of either Mr. Kincannon or Mr. Amatetti. On the contrary, they appeared to lean over backward in order to be meticulously fair and accurate. When they did not know the answer to a question, favorable or otherwise, they said so. When they were in doubt on a given matter, they freely admitted it. In short, to my mind they were highly credible and well qualified witnesses and their testimony is accepted by the court in every particular in which it is in conflict with the testimony of either Browne or McDermott.

Each and all of the foregoing Findings of Fact and Conclusions of Law are hereby reaffirmed and formally adopted.

For the above stated reasons, each and both of the above entitled actions are dismissed on the merits, with prejudice, and taxable costs awarded to the defendant.