Grady **SALSTER,** Administrator of the Estate of Jack Freeman Salster, Plaintiff,

v.

**SINGER SEWING MACHINE COMPANY et al., Defendants.**

No. EC 72–46.

United States District Court, N. D. Mississippi, E. D.

July 9, 1973.

David L. Coleman, Corinth, Miss., for plaintiff.

Charles C. Finch, Batesville, Miss., for plaintiff Singer.

Robert G. Krohn, Corinth, Miss., for St. Paul Fire & Marine Ins. Co.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this diversity case, Grady Salster, Administrator of the estate of Jack Freeman Salster (Salster), brings a death action against Singer Sewing Machine Company (Singer) and its employee, Jimmy Harding (Harding), arising out of a two-truck accident occurring January 14, 1971, in Alcorn County, Mississippi.[1] At the time of death, Salster, 25, was divorced and survived by two minor children, Charles Jeffrey Salster and Jackie Amelia Salster, who are the beneficiaries of the claim for death. St. Paul Fire & Marine Insurance Company was allowed to intervene as a plaintiff to assert its claim for sums paid and to be paid to the decedent's estate and his children as the workman's compensation carrier of Blue Springs Hatchery, in whose employ Salster was engaged at the time of his fatal accident.[2]

This case was tried to the court without a jury and the issues taken under advisement. The court incorporates in this opinion its findings of fact and conclusions of law as required by Rule 52 of F.R.Civ.P.

The background facts are largely uncontradicted. Harding, employed by Singer as the driver of an International tractor and trailer rig, left Trumann, Arkansas, bound for Georgia, at approx-

---

1. Leaseway Preferred, Inc., owner of the vehicle operated by Singer's employee, Harding, while originally joined as a defendant, was dismissed with prejudice pursuant to agreement of the parties.

2. St. Paul's pecuniary interest was stipulated as $5,334.04 representing funds paid in accordance with an Alabama court judgment, plus continuing payments of $157.50 at four-week intervals in accordance with statutory schedule.

**1058**

imately 10:30 p.m. on January 13. The trailer was loaded with sewing machine cabinets; the rig, including tractor, had an overall length of 52', and loaded weight of about 40,000 pounds. Enroute to Memphis, Harding encountered heavy rain which caused him to stop at West Memphis. Harding proceeded east on U. S. Highway 72 to Slayden, Mississippi, where the rainy, stormy weather worsened; he there pulled off the highway and waited more than an hour for the storm to subside. Highway 72, in this vicinity, is a two-lane blacktop road of standard width which generally runs east and west and traverses hilly terrain. Resuming the journey at 4:00 a. m., Harding, who was alone, proceeded east in the south traffic lane at a fairly constant speed of 35 to 40 mph, encountering intermittent heavy rain. The truck's headlights were burning on low beam. As Harding crested a hill several miles east of Walnut, he again encountered a sudden torrent of rain and somewhat reduced his speed. He saw the white line of the road illuminated by his headlights in the dark and rain. As Harding thus proceeded down the hill, he saw no object in this lane or the highway ahead, nor did he apply brakes until virtually the moment of impact with a Ford van truck which was parked in a westerly direction in the south traffice lane. Salster was the sole occupant in the van truck. Subsequent investigation revealed that the collision occurred 255' west of a highway bridge spanning Hatchie Creek, which is approximately 10 miles from Phillips Brothers Truck stop at Corinth.

Harding testified positively that as he descended the grade of the hill, the van truck was in the wrong lane for westbound traffic, and was without lights, until a second or two immediately before the collision when its headlights were turned suddenly on. Carl Womble and his wife, disinterested witnesses who had followed the Singer truck for approximately 6 miles just prior to the accident, asserted that they had a clear view ahead of the Singer truck as it crested the hill, which curved at that point, and, when Harding's vehicle began descending the hill, they saw no lights on the van truck or flares along the roadside to indicate the presence of the Salster vehicle. No flares were positioned, or later found, anywhere on the highway. The collision occurred during night hours, at approximately 4:30 a.m.

Salster, in his employ as truck driver for Blue Springs Hatchery, had left the hatchery the day before, bound for Memphis, Tennessee, with a cargo of tropical fish and boxed materials. After proceeding west on Highway 72, he stopped for gasoline at Phillips Brothers Truck Stop, only a few moments before the traffic accident occurred. According to J. A. Jones, the service station attendant, Salster appeared somewhat "run down" or fatigued; when Jones suggested that he should obtain some rest before proceeding on, Salster demurred and said that he had to get on to his destination. Within minutes thereafter Salster reached the Hatchie Bridge, where he apparently experienced motor trouble or had some difficulty driving in the severe weather. Whatever the reason, he left the north traffic lane and drove across the center of the highway upon the south shoulder. At that point, his truck stalled. Shortly thereafter, King Bobo and several companions drove up from the east, stopping to offer assistance. Almost at the same moment, A. J. Smith, operator of an ambulance from Corinth, who was proceeding westbound, observed the stalled van truck and also stopped. At this time the headlights on the Ford van truck were burning. Salster told Jones that Bobo and his companions would give the help he needed. When Jones proceeded on, Bobo and his companions physically pushed Salster's truck northerly across the highway into the north (or westbound) lane of traffic. Bobo testified that the truck appeared to be "flooded", or the motor "missing", but because heavy rain was then falling, he and his companions quickly returned to their vehicle and left the scene. As Bobo pro-

ceeded westwardly, he looked at his rear-view mirror and observed Salster's truck barely moving but it appeared to be returning into the south (or eastbound) lane of traffic. When Bobo observed this, he saw headlights burning on the van truck; Bobo, driving west, went out of view as he crested the hill and soon passed oncoming or eastbound traffic, presumably Singer's truck and the Womble automobile.

There was no evidence that Salster was drinking or impaired in any way except for Jones' impression of his fatigue or physical exhaustion. Neither does the evidence disclose whether the van truck, totally demolished by the impact, was, in fact, disabled or why Salster drove it on to the left side of the highway. In this stretch of the roadway several turnoff spaces, for use in case of need, were provided on and off the north shoulder. Salster had made frequent trips on the highway, and was familiar with Hatchie Creek, the creek bridge, the hills in the vicinity; he also was aware that Highway 72 between Corinth and Memphis was a busy United States highway, carrying considerable traffic both day and night.

As stated, the physical facts show from a gouge cut in the pavement that the two vehicles collided at a point 255' west of the west end of the Hatchie Bridge. From this point west to the crest of the hill measures a distance of about one-quarter of a mile. The cut or gouge was plainly located in the south traffic lane. Easterly of this mark, off the south shoulder of the road, were tire tracks in the mud indicating where Salster's truck was earlier stalled and pushed off by Bobo and his friends. There was absolutely no evidence that the collision occurred except in the south traffic lane, the lane which Harding affirmed his vehicle was in at impact. From the crest of the hill eastwardly the highway descended at a gradual angle, but in a straight line almost to where the collision took place. The highway was practically level from Hatchie Creek bridge to the gouge mark.

Plaintiff contends that Harding was negligent in three respects: (a) he operated his rig at a greater rate of speed than prudent in view of the existing adverse weather and traffic conditions; (b) he failed to keep an adequate lookout to see objects in the road ahead; and (c) he failed to stop his vehicle or take evasive action to avoid the collision once the Salster truck came within the range of his headlights. Plaintiff further contends that, even if Salster was contributorily negligent, that would not defeat the action but reduce recoverable damages. Contrarily, defendants assert that Salster's acts and omissions in allowing his truck to be on the wrong side of the road without lights, or, if disabled, without flares on the road constituted gross negligence and thus Salster's own conduct was the sole proximate cause of the collision and resulting death.

We find that Salster was, without our doubt, guilty of substantial, if not gross, negligence. He negligently permitted his truck to go on the wrong side of the road, allowing this to occur during the nighttime and under the most adverse conditions of stormy weather. When helped by Bobo and his friends, Salster's truck was placed in the proper lane of traffic. The truck apparently could move on its own power, but if the vehicle was disabled, Salster could safely leave the north lane of traffic by going on the north shoulder. Instead of doing that, he inexplicably drove the truck again into the wrong lane of traffic, oblivious to the known dangers of oncoming vehicles in nighttime travel on a busy United States highway. Further, we find as a fact that, whether because of fatigue, physical exhaustion or inattentiveness, Salster allowed his truck to stop, and for several minutes at least to remain stopped, on the wrong side of the highway without lights or other warning. Although he should have been aware of obvious hazard in so doing, the decedent made no attempt to turn on his lights until Harding's oncoming truck was almost upon him. It is unmistaka-

ble that Salster seriously breached the duty, which the law imposed, of ordinary care of a reasonably prudent person under the circumstances, and his negligent acts and omissions directly and proximately caused his death.

 As plaintiff points out, however, Salster's conduct, if regarded as gross negligence, may not defeat the action if Harding was himself negligent to any degree which proximately contributed to the collision. Mississippi's comparative negligence statute, Miss.Code Ann. § 1454, of course, does operate in that manner. Where the negligence attributable to the plaintiff and the defendant is concurrent, it has been observed that "the [Mississippi] comparative negligence statute has been held applicable whether the plaintiff's negligence was common-law or statutory, or whether it was characterized as ordinary or gross." 57 Am.Jur.2d, Negligence, § 444, p. 871.[3] The statute has no application where the negligence of the injured person was the sole proximate cause of the injury,[4] or where the sole proximate cause of the accident was the defendant's negligence. Trewolla v. Garrett, 200 Miss. 563, 27 So.2d 887 (1946).

The crucial question is whether Harding is fairly chargeable with concurring negligence that proximately contributed to the accident. The court, as the trier of fact, is thus confronted with the necessity to examine the evidence and resolve the conflicting inferences reasonably arising therefrom; our difficulty in deciding this single question of the case arises more from the choice of inferences from the peculiar factual circumstances than from application of legal principles.

 We begin our discussion by stating that in jury cases proximate cause is ordinarily a question of fact and rarely one of law. In this nonjury case, we are, therefore, guided by the following principle:

"The proximate cause of an injury is not a question of science or of legal knowledge, but is to be determined as a fact in view of the circumstances, and from a consideration of all the attending facts and circumstances present in the case under consideration, and of all the evidence, and in the exercise of practical common sense, rather than by the application of abstract definitions." 65A C.J.S. Negligence § 264, p. 918.

 We first examine plaintiff's contention that Harding was driving at a speed greater than prudent under the circumstances, considering the heavy load of his rig, the wet blacktop surface, the hilly terrain, and bad weather conditions. Yet the uncontradicted testimony from Harding and from the Wombles, the only witnesses on the issue of speed, fixed the speed of his truck, in regular travel before the wreck, at not more than 40 mph and this speed was reduced when heavy rain was intermittently encountered. Harding's speed was no more than 35 mph when he descended the hill. Although Mississippi has a 50 mph truck speed limit, Miss.Code § 8176, the rule of reason dictates that an operator go no faster than reasonably prudent in view of prevailing traffic conditions. The evidence indicates that other traffic was without difficulty moving in the close vicinity of the accident at or about the time of the collision, and the Wombles fully corroborate Harding's testimony that he was driving at a moderate speed just prior to the collision. Indeed, there is no credible evidence to support the argument that Harding's speed was unreasonable or excessive, or in itself constituted a hazard to other

---

3. Gulf & S.I.R. v. Bond, 181 Miss. 254, 179 So. 355 (1938), corrected 181 Miss. 254, 181 So. 741 and overruled on other grounds; Illinois Central RR v. Nelson, 245 Miss. 395, 148 So.2d 712 (gross negligence of plaintiff's decedent not sufficient to bar recovery). To same effect,

Yazoo & M. R. Co. v. Williams, 114 Miss. 236, 74 So. 835 (1917).

4. Mississippi Export R. Co. v. Summers, 194 Miss. 179, 11 So.2d 429 (1943), suggestion of error overruled 194 Miss. 179, 11 So.2d 905.

persons and vehicles on the highway. Plaintiff must, therefore, fail on the speed issue.

The related arguments regarding Harding's lookout and his failure to stop within the range of his headlights, although presenting a closer question, are equally without merit. Harding testified that he was looking ahead and was concentrating on staying within the eastbound lane of travel and watching the white line within the range of his low-beam headlights. We find this testimony to be reasonably consistent with the credible evidence and, therefore, worthy of belief. Although unable to impeach Harding directly, plaintiff claims that Harding's failure, upon his approach, to see the white-colored Ford van truck and to apply brakes are a basis to infer that he was not alert and carelessly failed to keep a proper lookout. Moreover, it is suggested that added proof of negligent lookout stems from Harding's failure to stop his vehicle or take evasive action once Salster's stalled truck came within the range of his headlights.

■ Mississippi is in accord with the generally recognized rule that when the vision of a motor vehicle operator is entirely obscured, because of the natural elements, smoke or other condition, he has a duty to stop, or negligence is implied by law. Butler v. Chrestman, 264 So.2d 812 (Miss.1972). This rule, of course, does not apply where conditions do not wholly block one's view, but only partially or temporarily; in the latter event, the reasonably prudent driver reduces speed and exercises an increased diligence. In this context, the *Butler* court, at p. 815, approved the general statement in 1 Blashfield's Cyclopedia of Automobile Law and Practice, § 743 (1948):

"A temporary obstruction of the view of a motorist will ordinarily affect his rate of speed, and require increased diligence. Under such circumstances he must exercise reasonable care to avoid a collision, and such care

requires him to stop if necessary or to substantially lessen his speed before plunging headlong into such an obstruction."

■ In the case sub judice, the uncontradicted evidence is that notwithstanding the heavy rain and adverse weather conditions, Harding's view of the highway was not entirely obscured, and he cannot be faulted for operating his truck on the highway at the time of the collision. As stated, Harding, peering ahead with windshield wipers in operation, drove at a reduced speed because of limited visibility. Further, Mississippi recognizes that the requirement for a motorist to operate at such speed as to stop his vehicle to avoid striking objects within the range of headlights is not a hard and fast rule, but the particular facts and circumstances of each case must be construed in determining whether the inability to so stop is negligence. Jester v. Bailey, 239 Miss. 384, 123 So.2d 442 (1960); Butler v. Chrestman, supra. In *Jester*, Chief Justice Ethridge stated that the range-of-vision rule was not an inflexible one, nor should it be arbitrarily applied. He wrote, (at p. 445):

"The range-of-vision rule is not an arbitrary rule of thumb to require 'infallibility of the nocturnal motorist.' The motorist must keep his car under such control that he can stop within the clear and unobstructed distance ahead of him, but in determining whether he should be held responsible, the character, appearance, and visibility of unlighted vehicles parked on the road must be taken into consideration."

Plaintiff would stress the testimony of Carl Womble, who stated that he had followed Harding's truck for some miles, and he was able to see an estimated distance of 300′ from his automobile to the rear of Harding's vehicle proceeding ahead, and argues that if Womble had such vision, Harding, with equally good headlights, should also have been able to see 300′ ahead; and, traveling not

more than 35 mph, Harding should have been able to observe the Ford van truck in time to either stop, slow down, or take evasive action to avoid the wreck. When judged by hindsight, this argument is not without force, but it ignores certain essential differences in the factors confronting Womble and those facing Harding. Womble was well aware of the lead truck, which was lighted and casting off spray behind. Womble purposely kept a watchful distance to the rear to avoid blinding Harding with his headlights while waiting for an opportunity to pass on the left. Womble's attention was thus directly focused upon the moving vehicle ahead. The situation as to Harding was quite different. Assuming that Harding has a vision range extending 300', this distance, at the speed of his truck, would be traveled in 5, not more than 6, seconds. He had no notice to anticipate an object in his traffic lane, especially an unlighted vehicle stalled at the bottom of the very hill that he was descending. The topography, when headlights are on low beam, reasonably suggests a different view than what may be present on level ground. An additional consideration is that lights suddenly appeared before Harding, a condition which we believe is apt to startle and blind the average person. Harding, perhaps so confused, cannot reasonably be charged with negligence simply because he did not react more quickly to apply brakes or take evasive action. Indeed, a swerving maneuver under such conditions might well produce his own injury, if not destruction. Reasonable care does not demand perfection of a motorist in the avoidance of accidents. Thus, considering the special circumstances disclosed by the evidence, the Court, as the fact-finder, is of the view that Harding did act with reasonable caution, prudence and good judgment, and it rejects inferences to the contrary, i. e., that his conduct was negligent.

Plaintiff's reliance upon Mississippi Power & Light Co. v. Lembo, 202 Miss. 532, 32 So.2d 573 (1947), is not well placed. First, *Lembo's* language which infers negligence as a matter of law under the "range-of-vision" rule is no longer authoritative since that doctrine was substantially relaxed, if not eroded, by the subsequent *Jester* and *Butler* cases. By these later decisions, the issue is ordinarily one for factual, and not legal, resolution. Second, *Lembo* is factually distinguishable upon a merits consideration of what is reasonably prudent. The truck driver in *Lembo,* as here, drove his vehicle 35 mph at night in heavy rain, but there the similarity of the two cases ends. In *Lembo,* both traffic lanes ahead were occupied by stopped cars headed in the same direction as the truck, but at least one of the stopped cars had lights burning. Still another vehicle, behind the two stopped cars, was approaching from the opposite direction. Against this silhouette, a woman went upon the highway and waved her arms to signal the approaching truck. The truck driver nonetheless saw nothing and continued without reducing speed. He did not discover the car stopped in his lane of traffic until he crashed into it, affirming that he was blinded by the lights of the oncoming vehicle. These factual elements in *Lembo* adequately served to place a reasonably prudent driver on notice of the danger ahead, and, in our factual judgment, ignoring, or failing to see, what should have been observable was negligent. *Lembo,* however, has no factual application to the present case since it does not appear that Harding had a fair opportunity, upon which he failed to act reasonably, to avoid the collision. It would, therefore, be unjust to impose liability upon the defendants by holding that Harding is presumed to have seen the unlighted van truck occupied by the decedent. We thus conclude that the decedent's negligence was the sole proximate cause of his death.

For the foregoing reasons, an order dismissing the complaint with prejudice shall be entered.