**Willie Sheeks BANDY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C–75–388.**

United States District Court, W. D. Tennessee, W. D.

June 29, 1978.

James S. Cox, Memphis, Tenn., for plaintiff.

Nicholas Gilman, Andrew J. Dilk, Federal Aviation Administration, Washington, D. C., W. J. Michael Cody, U. S. Atty., Memphis, Tenn., for defendant.

## MEMORANDUM OPINION

WELLFORD, District Judge.

This action against the United States for the allegedly wrongful death of the pilot and sole occupant of a single-engine Piper Arrow aircraft arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* Jurisdiction is premised on 28 U.S.C. § 1346(b).

The pilot, plaintiff's decedent, David C. Bandy, died in the crash of the aircraft at approximately 12:13 p. m.[1] on January 8, 1974, approximately one-half mile from runway 15L (left) at Thompson Field in Jackson, Mississippi. Willie Sheeks Bandy, individually and as Administratrix of the Estate of David C. Bandy, brings this suit against the United States government alleging that her husband's death was the result of the negligence of air traffic controllers and tower personnel at Thompson Field. The action was tried to the Court on November 14 through 17, 1977.

1. The Court will refer to time in this opinion in context of local Jackson, Mississippi time (Central Daylight Time).

## FINDINGS OF FACT

Bandy, who was 36 years of age, departed from Memphis International Airport at approximately 10:30 a. m. on January 8, 1974, in an aircraft, No. N859AP, owned by the Don Horn Company of Memphis. His initial destination was Hawkins Field, a field in close proximity to Thompson Field, Jackson, Mississippi. For reasons not disclosed by the proof, Bandy did not land at Hawkins Field. He made a missed approach at Campbell Field, a field approximately five miles north of Thompson Field, and subsequently crashed at or near Thompson Field, while making an instrument landing system approach. Evidence from the autopsy performed following Bandy's death suggested no cause of death other than the plane crash.

Earlier on the morning of his departure, Bandy telephoned the flight service station (FSS)[2] at Memphis. The flight service specialist on duty advised Bandy prior to 10:00 a. m. of the weather that he could expect from Memphis to Jackson, Mississippi, and the Jackson terminal weather to be expected on his arrival. Occasional instrument flight rules (IFR) weather conditions were expected along Bandy's route of flight and in the Jackson area. The specialist further advised Bandy that the Jackson area weather was expected to deteriorate from the visual flight rules (VFR) weather existing at the time of the briefing. The reports indicated imbedded thunderstorms occasionally forming in short lines in Mississippi south of a line stretching from Jackson to Meridian and moderate icing to be expected in clouds between 5,000 and 20,000 feet over Memphis, with the icing occurring at higher altitudes to the south. Weather conditions to the south and west of Jackson, showed poor visibilities and low ceilings. The flight service specialist at Memphis also advised Bandy that Jackson would have similarly poor weather later in the day. After the second briefing from the flight service specialist, Bandy filed his IFR flight plan to Hawkins Field in Jackson. The flight plan indicated that Bandy estimated his flight time to Hawkins Field to be one hour and twenty minutes with four hours of fuel aboard.

Bandy had been a military air traffic controller for four years, but had not flown actively for several years prior to 1974. Just three months before the accident, Bandy had been hired by the Don Horn Company to sell aviation instruments and machinery. He had been requalified to fly under instrument flight rules for about sixty days prior to January 8, 1974. His own log books show that he had flown only 4.7 hours of actual instrument time in the previous four years, all of that in the last sixty days of 1973 and early 1974, principally during good weather conditions. He had, however, additional unlogged airtime in this period, according to information in the accident report.

At all times pertinent to the matters herein, the air traffic controllers and tower personnel at Thompson Field, were agents, servants and employees of the United States government and were acting in the scope and course of their employment with the United States government.

At approximately 11:42 a. m., N859AP arrived at Vaughan intersection at a geographical position within twenty-three miles north of Bruce Campbell Field, another airport in Jackson, Mississippi. At 11:45 a. m., the FAA controller at Jackson Approach Control gave Bandy a special weather advisory, informing him that he would "encounter moderate to heavy rain about four or five miles north of the VOR (Jackson VOR) and it extends south of Campbell Field, and there are some thunderstorms in the area."[3] At 11:49 a. m., Bandy was

2. An FSS is the general aviation pilot's primary source of preflight and inflight weather briefings. Instrument Flight Rule (IFR) flight plans are also filed through the FSS.

3. The Jackson VOR was a very high frequency omnirange navigational aid used for both en route navigation and instrument approaches to Bruce Campbell Field and Thompson Field. This navigational aid also had a feature which provided aircraft like N859AP installed with distance measuring equipment (DME) a direct indication of their distance from the VOR.

cleared through two-way radio communications for an instrument approach to Campbell Field using the Jackson VOR. The air traffic controller at the AR–1 position at Thompson Field, advised Bandy to turn left on a heading of 170 and cleared him for a VOR approach to Campbell Field. These instructions from the controller at the AR–1 position were acknowledged by Bandy. Again, at 11:52 a. m., the FAA controller advised Bandy of the local weather, stating that the "Jackson weather [is] now measured ceiling two hundred [feet] overcast, visibility three quarters of a mile, thunderstorm, light rain showers, [and] fog." Approximately six minutes later, through the use of his air traffic control radar, the radar approach controller was able to discern and volunteered to Bandy that N859AP was on the western edge of the runway at Campbell Field. Immediately thereafter Bandy informed the controller that he was commencing a missed approach.[4] The controller then asked for Bandy's intentions. In response to this inquiry, Bandy requested advice as to the Jackson weather:

"Uh, Roger, what's, is Jackson still, uh, reporting like you said?"

to which the traffic controller at position AR–1 advised:

"Uh, measured two hundred, overcast, visibility down to one half mile now, the R V, runway visual range, one five left is more than six thousand."

Following this communication, traffic controller AR–1 issued instructions to Bandy in an attempt to vector him into an instrument landing system approach at Thompson Field at Jackson. This instrument landing system approach (ILS) to Thompson Field was more precise than the non-precision VOR approach to Campbell Field, permitting a pilot using both glide path and precise azimuthal information to descend safely to two hundred feet above the ground (AGL) in one-half mile visibility before seeing the runway threshold. The VOR approach to Campbell Field, on the other hand, permitted a descent only to five hundred feet AGL with one mile visibility. The ILS approach, furthermore, provided a means of alignment directly with the runway center line. Bandy also asked for and was provided with radar directional assistance (vectoring) to the final approach course for the ILS to runway 15L at Thompson Field.

There were significant, adverse weather conditions existing prior to and during the time which Bandy was attempting to make his instrument landing system approach into Thompson Field, which the FAA personnel on duty at the Jackson tower, Thompson Field, as well as Bandy himself, knew or in the exercise of that degree of care and skill expected and required of them should have known.

The weather continued to deteriorate, and once again the air traffic controller gave Bandy meteorological information. The changed weather conditions given to Bandy measured two hundred feet overcast, visibility at one-half mile and runway visual range (RVR) on runway 15L of 6000 feet. From noon until almost 12:05 p. m., the air traffic controller continued to provide Bandy with navigational assistance to help him to align his aircraft with the ILS final approach course. At 12:07 p. m., the air traffic controller told Bandy to change frequency to monitor the Thompson Field control tower and to report to the tower when his aircraft had reached the outer marker.[5]

---

4. A maneuver conducted by a pilot when an instrument approach cannot be completed to a landing. The route of flight and altitude to be flown are shown on the instrument approach procedure chart.

5. To operate under IFR, an aircraft is required to have only one operational transmitter and only one operational receiver. Under the Procedures Manual (7110.8C) used by terminal radar controllers on January 8, 1974, paragraph 1360 requires the approach controller to issue one of the following instructions to an aircraft on an instrument approach:

"(1) Monitor local control [tower] frequency, reporting to the tower when over the approach fix [here the outer marker].
(2) Contact the tower on local control [tower] frequency."

Aircraft N859AP had several indicators that would notify Bandy when he was over the outer marker: (1) distance measuring equipment (DME), (2) an automatic direction finding (ADF) capability, and (3) both aural and visual signals from the outer marker beacon itself. For some inexplicable reason, Bandy delayed or did not change his frequency to the tower because he failed to locate his position in relation to the outer marker. The radar approach controller therefore again instructed Bandy to contact the control tower via the proper frequency. That transmission was the last known communication to or from Bandy.

As early as 11:44 a. m. it was known to the Jackson traffic controller that there were weather buildups all over and around the outer marker, the final approach course and the VOR at the airport. At 11:47 a. m., the local controller in the cab had observed lightning over the airport, and had heard thunder. He then knew that there were buildups about the airport vicinity. At 11:59 a. m., the traffic controller at position AR–2 Jackson instructed a Southern Airlines flight to stop his turn in order to take him south of most of the weather that the controller at AR–2 was then observing on his scope. That air traffic controller at about 12:02 p. m. also issued heading instructions to another aircraft to provide a heading to avoid some of the weather. Shortly after, he asked the local controller for the weather and was advised of the existence of a thundershower and a light rainshower in the area.

At 12:05 p. m., the local controller also advised an Air Force plane, 147, that the Jackson weather had a ceiling of 200 feet, was overcast, visibility one-half mile, with thunderstorms, light rainshowers and fog, runway 15 visual range more than 6,000. At 12:06 p. m., a Beechcraft inquired of the traffic controller at the AR–1 position about current Jackson weather, to which inquiry the traffic controller replied:

". . . Jackson weather is measured ceiling two hundred, overcast, visibility one half mile, thunderstorm, light rain showers, fog."

Upon further request about the situation, he responded:

"The weather here is moving east, and extends at least thirty miles west of Jackson, so it'll be, should be in this, uh, area for quite a while."

At 12:08 p. m. the traffic controller advised another, as follows:

". . . the Jackson weather is measure ceiling two hundred overcast, visibility one half mile, thunderstorm, light rainshowers and fog, and for your information, uh, I have a Cherokee Arrow missed approach at Campbell Field five minutes ago."

At 12:11 p. m., the traffic controller at AR–1 advised that same aircraft:

"November eight, correction, two nine three five nine, show weather area south of you about fifteen miles wide, and, uh, it's, uh, pretty heavy precipitation area, but there's a break in it right on the final approach course, I'm trying to keep you north of it til the turn final." (This transmission occurred about a minute prior to the sound of the emergency locator beacon emanating from Bandy's plane).

Bandy called the Jackson tower at 12:09 p. m., giving his position at the outer marker proceeding inbound to the runway. In response the tower operator gave Bandy clearance to land on runway 15L and stated the wind on the runway as eight knots from a direction of 150° magnetic, directly down the runway. Bandy apparently, however, did not hear any tower transmissions. The following transmissions occurred thereafter:

1209:20 Bandy: "Ah, Jackson Tower eight five nine Alpha Papa over the outer marker inbound."

1209:25 LC/GC "November eight five nine Alpha Papa Jackson Tower. Cleared to land Runway one five left wind one five zero degrees at eight."

1209:30 Bandy: "Jackson Tower how do you read over."

AR/DR 1 "Five nine AP is over the marker."

LC/GC: "RC"

1209:35 LC/GC: "November eight five nine Alpha Papa cleared to land Runway one five left, wind one five zero degrees at one zero."

1209:45 AR/DR 1 "You talking to five nine AP?"

LC/GC "He's talking to me but I don't think I'm talking to him."

1209:50 LC/GC "November eight five nine Alpha Papa Jackson Tower How do you hear?"

Bandy "Alpha Papa how do you read over"

LC/GC "November nine Alpha Papa Jackson Tower How do you hear?"

1210:00 LC/GC "Nine Alpha Papa tower How do you read?"

1210:05 LC/GC "November nine Alpha Papa this is Jackson Tower on guard frequency. How do you hear me?"

1210:15 LC/GC "He won't talk to us Jack."

AR/DR 1 "Okay."

1210:20 LC/GC "His correct number is eight five nine Alpha Papa right?"

AR/DR 1 "Right."

LC/GC "Okay."

1210:25 AR/DR 1 "He's off course but he's correcting now."

1210:30 LC/GC "Say again."

1210:35 AR/DR 1 "He was off course and he's back on course now three out."

LC/GC "RC"

1210:40 LC/GC "November eight five nine Alpha Papa Jackson Tower."

1211:10 LC/GC "November nine Alpha Papa Jackson Tower."

1211:15 LC/GC "November eight five nine Alpha Papa cleared to land Runway one five left wind one five zero degrees at one zero."

1212:10 AR/DR 1 "Alpha Papa one and half out a little right of course."

LC/GC "I'm not talking to him."

1212:15 LC/GC "November eight five nine Alpha Papa You're slightly right of course cleared to land Runway one five left."

1212:25 LC/GC "November eight five nine Alpha Papa Radar reports you're slightly right of course."

1212:45 LC/GC "November eight five nine Alpha Papa Jackson Tower On guard cleared to land Runway one five left wind one five zero degrees at one zero."

1213:05 (Emergency Locator Transmitter Signal Received on 121.5MHz)

1213:15 LC/GC "Still see him Jack?"

1213:20 AR/DR 1 "Yea. He's about over the end of the runway."

1213:45 AR/DR 1 "He made a sharp S turn. Did he land?"

1213:50 LC/GC "I don't see him on the runway Jack."

AR/DR 1 "Has to be out there somewhere or on the ground one. Look for him. Look for him."

Bandy was advised of the existence of thunderstorms at 11:51:43 a.m. But when at 11:59:21 Bandy inquired, "Uh, Roger, what's, is Jackson still reporting like you said?", the air traffic controller AR–1 at 11:59:24 replied, "uh, measured two hundred, overcast, visibility down to one half mile now, the RV, runway visual range, one five left is more than six thousand." Plaintiff contends that the failure of the air traffic controller during this transmission to advise Bandy of the existence of a thunderstorm rendered this report as to the current prevailing conditions erroneous and inaccurate, and that Bandy could have believed the thunderstorm previously reported had dissipated and would not interfere with his landing.

Bandy failed to set up his communications facilities properly and his ADF was also improperly tuned. The "pretty heavy" precipitation area at approximately 12:11 p.m. during Bandy's total approach lay to the north and east of Thompson Field and also the north and east of the ILS final approach course. The ILS final approach course and the airfield itself were outside of the area of heavy precipitation in areas that showed little, if any, precipitation on the radar controller's radar scope. The light precipitation existing on the ILS final approach course and over the airfield was

being eliminated by circular polarization and MTI gain on the Jackson radar. Another plane, N29359, was on the ILS final approach course to Thompson Field within six minutes of the Bandy crash. The pilot, an experienced flight instructor, stated that along the ILS final approach, "the heavy rain had stopped. There was probably light rain or light drizzle but it was solid clouds all the way down. On the ILS from the outer marker, which is your final approach fix, all the way in, there was no heavy turbulence or heavy rain or anything. There was some turbulence, but it was probably just light to moderate; it was not heavy." He never saw any lightning or other signs of a thunderstorm during his flight along the ILS final approach course to Thompson Field. He broke out of the overcast at the decision height, two hundred feet above the ground. The continually deteriorating weather was at a minimum for that ILS approach when the pilot of N29359 broke out of the overcast. The Thompson Field ILS localizer and glide slope were working properly on January 8, 1974, and the approach lights were turned up to maximum intensity to assist pilots to locate the runway. The ILS to runway 15L was constructed to permit an instrument approach in weather conditions as low as two hundred feet overcast and visibility of one-half mile.

The ILS approach system for runway 15L at Thompson Field available to Bandy to fly the approach gave information which required an aircraft to fly the approach within two and one-half degrees on either side of the final approach course and to descend no lower than the decision height unless the aircraft was in a position from which a normal approach to the runway could be made.[6] Along his ILS final approach, Bandy deviated beyond the permitted two and one-half degrees on either side of this final approach course and descended below the minimum decision height when a safe landing to Thompson Field was not assured, particularly without proper communication. Near the approach end of runway 15L, Ban-

dy had completed what the radar controller described as an "S" turn, a maneuver which affected his ability to make a normal, safe approach to runway 15L.

During the ILS approach, Bandy's plane was generating a radar reply signal called a transponder code which answered an interrogation from the Jackson radar approach control. The Jackson approach controller received this radar reply signal for some seconds after Bandy's emergency locator transmitter (ELT) was activated at 12:13 p. m. Evidence showed that N859AP hit trees prior to coming to rest along a path oriented on a magnetic bearing of 245° approximately three hundred feet to the right of the middle marker that was one-half mile from the end of runway 15L.

The radar controller testified and defendant's air traffic control expert confirmed that as the "blip" or transponder return approached within one-half mile of the airfield, the distance of the displayed aircraft from the superimposed video map display of runway 15L would be so small as to make that transponder blip appear "about over the end of the runway."

The weather was moving in the general direction of west/southwest to east/northeast and could cause the Bandy aircraft to encounter a strong cross wind. As Bandy's aircraft penetrated the weather front or mass, significant turbulence could have been encountered.

Two expert witnesses provided the thrust of the testimony in plaintiff's case. Dr. Joseph Goldman testified to meteorological conditions which, in his opinion, existed at about the time of the accident. Mr. Frank M. McDermott gave his opinions as to the duties of and the care shown by the air traffic controllers in handling the Bandy flight.

Goldman testified that based on National Weather Service (NWS) radar observation logs and surface weather observation logs made on the date of the accident and covering the time of the accident and also weather radar photographs taken from Jackson

6.   14 C.F.R. § 91.117.

during the time that N859AP was flying on the ILS final approach course to Thompson Field, a thunderstorm was located over or about Thompson Field and along the ILS approach to it. In interpreting the weather radar photographs, Goldman, who never worked under NWS directives, did not fully consider the effect of ground "clutter" and present attenuation of the radar that would or could block out certain weather returns on the Jackson weather radar. Radar "returns" close to the airport could not be definitely identified as thunderstorms. The NWS radar and surface weather observations and radar photographs from Jackson during the time that Bandy was flying the final approach course did not positively register any severe thunderstorms at or in the vicinity of Thompson Field or the ILS final approach course. Based on the movement of weather at approximately 12:13 p. m., the only identified thunderstorm[7] close to Thompson Field was to the northeast and had not been observed by Jackson ground observers since noon.

McDermott was a fully qualified, unsupervised air traffic controller and had worked as an en route air traffic controller some years ago before radar was operational in the en route air traffic control centers. It was his opinion, among others, that the ELT on Bandy's aircraft was triggered by turbulence. The Court finds this to be speculation unsupported by the facts or any expert knowledge regarding the technical workings of the equipment. It was also McDermott's opinion that the radar controller was guilty of negligence.

Thunderstorms are dangerous for pilots because they may be accompanied by strong gusts of wind, turbulence and icing. The air traffic controller must relay thunderstorm information to a pilot. All thunderstorms to some degree are turbulent and are potentially dangerous to aircraft.

From 11:30 a. m. to Noon on January 8, 1974, the weather conditions at Thompson Field were adverse. The weather conditions included a large area of scattered thunderstorms extending approximately 30 miles west of Thompson Field and moving toward or around Thompson Field. This thunderstorm activity represented potentially hazardous conditions to the flight of aircraft in the vicinity of and at the airport. The air traffic controllers at Thompson Field were in a superior position to that of Bandy as to the knowledge of existing weather conditions due to the controllers' knowledge of recent weather reports and the radar information available, and from extended observation of weather conditions in the vicinity of the airport. The air traffic controllers knew, or in the exercise of reasonable care, should have known that the above described weather conditions were difficult for Bandy's attempted landing.

The defendant, United States of America, by and through its air traffic controllers, may have been negligent by reason of the following acts and omissions in the handling of the flight of David C. Bandy:

(a) The air traffic controllers failed to coordinate with each other and with Bandy in order to apprise him fully of the weather conditions, particularly as to possible thunderstorms after 11:51 a. m.

(b) The controllers provided clearance for Bandy to land into possible thunderstorm activity without fully communicating the most recent information on thunderstorms in the area.

There was also clear evidence of negligence on the part of Bandy proven as a

---

7. The NWS criteria for logging thunderstorm beginnings and endings were:

"3.2.1 *Beginning of a Thunderstorm.* A thunderstorm is considered to begin at a station when
  a. Thunder is heard
  b. Overhead lightning or hail is observed, and the local noise level is such as might prevent hearing thunder."

"3.2.2 *Ending of a Thunderstorm.* A thunderstorm is considered to have ended 15 minutes after the last occurrence of any of the criteria in ¶ 3.2.1."
*Federal Meteorological Handbook No. 1,* Surface Observations at A7–15.
  The last observed thunderstorm at Thompson Field was at twelve noon.

proximate cause of the crash. Bandy did not have his airplane under proper control after he reached the outer marker, he varied from the directed course, and he made gyrations coming down the localizer course, disregarding required procedure for this type of landing. Plaintiff contends this was due to Bandy's encountering severe turbulence and wind shear during the time of his approach, but the Court finds that the erratic flight as described was not demonstrated to be the result of any turbulence or shear.[8] No other planes landing at or about this time reported any such difficulty. Bandy's decision to try his recently untested skills in the low ceiling and poor visibility at Jackson and his subsequent inability to fly the ILS approach safely and properly are direct causes of the crash.

Bandy knew about weather problems in the area and had known about this situation for a considerable period before his attempted landing. He also knew that there was visibility of only 200 feet and that he had just unsuccessfully attempted a landing at a nearby airport. He had experienced very little recent "weather time" before this episode. His own actions and conduct in attempting such a landing, especially without adequate and proper communication with the tower during the approach, were negligent. The air traffic control personnel at the airport acted in accordance with regulations and with prudence even if the radar controller failed in one instance to note thunderstorms or possible thunderstorms to Bandy after 11:52 a. m. in the course of numerous assisting transmissions.

The Court does not find that defendant or its agents failed correctly to advise Bandy about conditions of visibility throughout nor can the Court find that the emergency locator beacon was triggered by anything but the crash itself.

CONCLUSIONS:

■ I. Although the actions of the radar control operator, Reed, at the AR–1

position were not entirely coordinated with other activity of air traffic tower control personnel at the time of the fateful approach by Bandy, this conduct was not a direct and proximate cause of the crash and Bandy's death. The failure on one single occasion to advise of possible thunderstorms was not a proximate cause of the tragedy which is the source of this controversy. All the other circumstances lead to a conclusion that Bandy was determined to land in the immediate Jackson vicinity despite adverse weather conditions which should have been evident and obvious to a normally careful pilot in his position at the time.

■ II. The law of Mississippi applies and Federal Aviation Regulations have the force and effect of law. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Maryland Casualty Co. v. United States*, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1920); *Sawyer v. United States*, 297 F.Supp. 324 (E.D.N.Y.1969), aff'd 436 F.2d 640 (2d Cir. 1971); *Tilley v. United States*, 375 F.2d 678 (4th Cir. 1967). A violation of the Federal Aviation Regulations has been held to be negligence as a matter of law. *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443 (3d Cir. 1968). Bandy himself violated applicable regulations in his operation of the plane in the approach procedure.

■ III. The primary responsibility for the safe operation of an aircraft is upon the pilot. 14 C.F.R. § 91.3; *Thinguldstad v. United States*, 343 F.Supp. 551 (S.D.Ohio 1972). This primary responsibility of the pilot remains with him even in case of an instrument landing. See *United States v. Schultetus*, 277 F.2d 322 (5th Cir. 1960), cert. den. 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960); *In re Air Crash Disaster at New Orleans, La.*, 422 F.Supp. 1166, 1175 (W.D.Tenn.1975), aff'd, 544 F.2d 270 (6th Cir. 1976); *American Airlines v. United States*, 418 F.2d 180, 193 (5th Cir. 1969).

---

8. There was at the critical times no demonstrated abrupt change in temperature, dewpoint, wind direction or flow, or in pressure, which are normal indicia of severe thunderstorms and turbulence.

**22**

■ Bandy had numerous, accurate weather advisories to provide him with all the information he needed to make a safe decision. He should have realized his own inexperience and limitations, but he disregarded them. Warnings and precautions available to pilots about the caution required and the difficulties experienced in weather flying were also ignored.

Once at the Decision Height (DH), Bandy should have begun a missed approach procedure if the runway threshold could not be seen and safely reached. 14 C.F.R. § 91.-117(b). In failing to assure a safe landing by not following instructions, he carelessly failed to follow regulations requiring compliance with the approach plate. 14 C.F.R. §§ 91.10, 91.116, 91.117. *Klein v. United States*, 13 Av.L.Rep. (CCH) ¶ 18.137 (D.Md. 1975); *see generally In re Aircrash Disaster at Boston, Mass.*, 412 F.Supp. 959 (D.Mass. 1976), *aff'd sub nom. Delta Airlines, Inc. v. United States*, 561 F.2d 381 (1st Cir. 1977).

IV. Because he failed to maintain proper communications, Bandy could not receive help from the air traffic controllers although they made careful efforts to guide him through the approach. Bandy's decision to land instead of going elsewhere under known weather conditions and the lack of pilot proficiency under these circumstances demonstrated throughout the approach procedure are the sole proximate causes of this accident. In short, Bandy assumed the risks of hazardous weather conditions, lack of experience, improper communications and improper procedures followed in the attempted landing. Bandy had actual knowledge of the danger involved. He understood and appreciated the risks in landing under the circumstances of very low visibility and bad weather, but voluntarily made the decision to land nonetheless. *See Shurley v. Hoskins*, 271 So.2d 439 (Miss.1973).

V. The duties and responsibilities of air traffic personnel are set out in the Procedures Manuals and are in accordance with the ordinary standard of due care under the circumstances. *See Baker v. United States,* 417 F.Supp. 471 (W.D.Wash.1974). The one

failure to specify to Bandy the possible existence of thunderstorms at or near Thompson Field was remote and not a proximate cause; it was not under the circumstances a concurrent cause of the crash. Bandy himself committed to a landing and was capable of seeing and appreciating current weather conditions and lack of visibility. Actual weather conditions were not so severe that competent pilots exercising reasonable skills could not land safely at the time with the help of defendant and the air traffic controllers.

VI. Bandy committed himself to a landing with adequate advice from defendant's personnel, although, as before stated, it was not as well coordinated as it might have been. Once Bandy made the decision to land, he could have landed safely if he had followed proper procedures and relied upon the advice and assistance of air traffic controllers and other supportive safety equipment and devices available. *Compare Yates v. United States*, 497 F.2d 878 (10th Cir. 1974) *with Salster v. Singer Sewing Machine Company*, 361 F.Supp. 1056 (N.D. Miss.1973). Despite the pilot's duty of primary responsibility, the controller must warn, using reasonable care, of any facts which are deemed material to the safe operation of the plane. *United States v. Furumizo*, 381 F.2d 965 (9th Cir. 1967). Bandy was not at any time, however, in any extreme danger due to weather conditions provided he exercised proper precautions and procedures. He had been adequately and reasonably advised of existing weather conditions.

■ VII. Plaintiff has failed to prove by a preponderance of the evidence that the defendant committed a negligent act that was a concurrent, direct, proximate cause of the crash of the aircraft which he was piloting negligently. The Mississippi comparative negligence doctrine, therefore, does not come into play in this case.

Counsel for both parties have presented the case diligently and capably and their respective memoranda have been helpful to the Court in resolving the difficult issues presented.

Judgment will accordingly be entered for the defendant in this case. Each party will bear its own costs.